## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| THE NATIONAL ASSOCIATION OF BROADCASTERS,<br><br>*Petitioner*,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br><br>*Respondents*. | No. 14-1154 |

---

### EMERGENCY MOTION BY
### THE NATIONAL ASSOCIATION OF BROADCASTERS
### FOR EXPEDITED CONSIDERATION OF THIS PETITION FOR REVIEW
### AND AN EXPEDITED BRIEFING SCHEDULE

---

Rick Kaplan
Jane E. Mago
NATIONAL ASSOCIATION OF
BROADCASTERS
1771 N Street, N.W.
Washington, D.C.  20036
(202) 429-5430

Miguel A. Estrada
  *Counsel of Record*
Scott P. Martin
Lucas C. Townsend
Ashley S. Boizelle
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
(202) 955-8500

*Counsel for Petitioner National Association of Broadcasters*

## INTRODUCTION

Pursuant to Federal Rules of Appellate Procedure 2 and 27, and this Court's Rule 27, Petitioner the National Association of Broadcasters ("NAB") respectfully moves for expedited briefing and oral argument in this proceeding.[1]  This petition concerns a narrow but critical question of statutory interpretation, arising out of a final order recently adopted by the Federal Communications Commission ("Commission" or "FCC") pursuant to Title VI of the Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. 112-96, 126 Stat. 156, 201 (the "Spectrum Act"). *See* Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions, FCC 14-50, GN Docket No. 12-268 (rel. June 2, 2014) (the "Order").  The Spectrum Act authorizes the Commission to reorganize and repurpose broadcast television spectrum through a market-based "incentive auction."  In particular, the Commission shall:  (1) conduct a "reverse auction," in which television broadcasters that currently hold spectrum rights may voluntarily sell those rights to the Commission in exchange for remuneration; (2) reassign and repack any television broadcasters that choose to retain their spectrum rights into a smaller

---

[1]  NAB is a non-profit trade association that advocates before Congress, the Federal Communications Commission and other agencies, and federal courts on behalf of local radio and television stations and broadcast networks.  NAB has standing to bring this action on behalf of its members because they would have standing to sue in their own right, the interests that NAB seeks to protect are germane to its purpose, and the claims and relief do not require the participation of individual members in this lawsuit.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

band of spectrum; and (3) conduct a "forward auction," in which the relinquished broadcast spectrum is sold to wireless carriers and other bidders seeking to license it for mobile broadband use. *See* 47 U.S.C. § 1452(a)-(c).

In the Spectrum Act, Congress sought to ensure that the Commission would balance its efforts to make more spectrum available to wireless providers with the important goal of preserving the service areas and viewership of existing broadcast television licensees who choose not to participate in the voluntary auction. Congress therefore required the Commission to make "all reasonable efforts to preserve, as of February 22, 2012, the coverage area and population served of each broadcast television licensee." 47 U.S.C. § 1452(b)(2). Moreover, Congress specified the exact means the Commission must use to calculate broadcasters' coverage areas and populations served, stating that it must "us[e] the methodology described in OET Bulletin 69," when conducting the reassignment and repacking of broadcast television licensees. *Ibid.*

Despite this unambiguous command, a narrowly divided Commission voted 3-2 to disregard the statutory protections for broadcasters. *First*, the Commission determined that it would preserve each broadcaster's coverage area only "to the degree that the area is populated," Order ¶ 114 n.372, thus expressly electing not to protect broadcasters' coverage areas as well as their populations served, as required by the Spectrum Act. The Commission thus effectively rendered "coverage

2

area" redundant of "population served."   47 U.S.C. § 1452(b)(2).   *Second*, the Commission changed the computer program and data described in OET Bulletin 69, notwithstanding the express statutory requirement that coverage and population be preserved as of February 22, 2012, as "determined using the methodology described in OET Bulletin 69."   *Ibid.*; *see also* Order ¶¶ 127-161; FCC, OET Bulletin No. 69, *Longley-Rice Methodology for Evaluating TV Coverage and Interference* (Feb. 6, 2004) ("OET Bulletin 69").   *Third*, the Commission chose to ignore "fill-in translators"—retransmission stations used by broadcasters that were expressly authorized by the Commission to fill gaps within their licensed coverage areas—even though the statute requires "all reasonable efforts to preserve . . . the coverage area and population served of each broadcast television licensee."   47 U.S.C. § 1452(b)(2).   The plain text of the Spectrum Act forecloses the Commission's actions.   Moreover, the Commission's adoption of the new computer program was arbitrary and capricious, and violated the Administrative Procedure Act ("APA").

This Court should expedite consideration of this petition to avoid irreparable harm to NAB's members.   The incentive auction is scheduled for mid-2015.   If this petition follows the standard briefing and argument timeline, however, the auction will take place before the case can be decided.   *See* Fed. R. App. P. 17(a), 31(a).   NAB does not believe that any court has ever vacated the results of a Commission auction after it has occurred.   As a result, broadcasters assigned to new channels

following the auction could be forced to accept reductions in their coverage area and population served, with no practical remedy.  And even if this Court were to order the auction to be redone, broadcasters (like all other auction participants) would then be forced to bear twice the substantial, unrecoverable costs of preparing a bid.  Moreover, broadcasters must make substantial preparations before the auction, including conducting consumer outreach to minimize service disruptions and planning for new competition from repacked broadcasters and wireless providers.  For that reason, the Commission concedes that the auction's repacking rules must be resolved "well in advance of the auction."  Order ¶ 145.

Wireless providers and the public also have a significant interest in the prompt disposition of this petition.  Denying expedition would place the entire broadcast industry at risk of committing to an expensive and legally flawed process that will be impossible to unwind fully, thus jeopardizing the success of the auction and threatening to disrupt broadcast television service for millions of viewers.

NAB proposes the following schedule for expedited briefing:

| | |
|---|---|
| Brief for Petitioner | 30 days after entry of this Court's order granting NAB's motion to expedite |
| Brief for Respondent | 30 days after service of Brief for Petitioner |
| Reply Brief for Petitioner | 14 days after service of Brief for Respondent |

NAB respectfully requests that oral argument be scheduled as soon as practicable

upon completion of briefing so that a decision may issue in advance of the mid-2015 auction. If the Court does not order the above schedule, NAB respectfully requests an accelerated schedule that the Court deems just and reasonable.[2]

NAB has notified the Clerk of the Court and opposing counsel of this motion by telephone and email. FCC counsel has authorized NAB to state that the Commission will inform the Court of its position promptly after being served with this motion. The United States takes no position on the motion. NAB respectfully requests a ruling on this motion by September 5, 2014.

## BACKGROUND

Every television broadcaster holds the right to broadcast on a specific frequency. In 2012, Congress instructed the Commission to hold an incentive auction to open existing broadcast spectrum to the commercial wireless industry. *See* 47 U.S.C. § 1452. Congress designed the incentive auction to proceed in three steps.

*First*, the Commission must hold a "reverse auction to determine the amount of compensation that each broadcast television licensee would accept in return for voluntarily relinquishing some or all of its broadcast television spectrum usage

---

[2] NAB recognizes that its principal brief may be due within the 60-day period for filing a petition for review. 28 U.S.C. § 2344. NAB is not aware of other likely challengers, and any other challenges are unlikely to contest the same issues or aspects of the Order at issue here. Moreover, parties with an interest in these issues can seek to intervene if warranted. If additional challengers surface, this Court has ample authority to manage its docket by modifying the expedited briefing schedule as appropriate to include those challengers. The possibility of other challengers should not delay decision of the important questions raised by NAB's petition.

rights." 47 U.S.C. § 1452(a)(1). Broadcasters are then permitted to sell their spectrum rights voluntarily to the Commission for remuneration.

*Second*, the Commission may "repack" remaining broadcasters in a smaller band of the spectrum by "mak[ing] such reassignments of television channels as the Commission considers appropriate" and "reallocat[ing] such portions of such spectrum as the Commission determines are available for reallocation." 47 U.S.C. § 1452(b)(1). In other words, the Commission may reassign broadcasters who choose not to participate in the auction to a new frequency and thus a new television channel, leaving a continuous band of empty spectrum to sell to others. In making reassignments, the Commission "shall make all reasonable efforts to preserve, as of February 22, 2012, the coverage area and population served of each broadcast television licensee, *as determined using the methodology described in OET Bulletin 69*." *Id.* § 1452(b)(2) (emphasis added).

*Third*, the newly available spectrum will be auctioned off to mobile broadband providers in a standard "forward" auction. *See* 47 U.S.C. § 1452(c).

The Order at issue here finalizes rules to conduct the incentive auction. In particular, the Commission interpreted the "coverage area" protected by the statute to mean those areas within the broadcaster's "noise-limited contour"—the boundary of the area that the broadcaster's signal now reaches—where the signal strength exceeds certain levels, consistent with the "service area" described in OET Bulletin

6

69 and section 73.622(e) of the Commission's Rules. *See* Order ¶ 164. However, the Commission elected to take steps to preserve coverage area only to the extent that the area is *populated*. *See id.* ¶¶ 114 n.372, 162-166. The Commission also decided to "update" the computer program and underlying data described in OET Bulletin 69—the document describing the Commission's longstanding methodology for calculating interference between broadcast signals and generating calculations of coverage areas and population served. *See id.* ¶¶ 127-161. The Commission's new computer program, called "*TVStudy*," relies on new data sources and fundamentally changes the methodology described in OET Bulletin 69. Finally, the Commission refused to preserve the coverage areas and populations that broadcasters serve with fill-in translators, which rebroadcast the main station's signal to fill gaps in that signal's coverage. *See id.* ¶ 242 n.747.

Two of the five Commissioners dissented from this decision. Commissioner Pai argued that the Order "run[s] afoul of Congress's mandate" because *TVStudy* "departs in several respects from the methodology described in OET-69." Order at 478. Commissioner O'Rielly echoed this concern, objecting that "Congress was abundantly clear that it wanted to hold harmless non-participating broadcasters in their ability to serve their over-the-air viewers." *Id.* at 484.

In addition to violating the Spectrum Act, the Commission's adoption of *TVStudy* is procedurally and substantively infirm under the APA. *First*, the Com-

mission's ultimate adoption of *TVStudy* was not a logical outgrowth of the Commission's 2012 notice of proposed rulemaking, which made no mention of *TVStudy* or any intention to change OET Bulletin 69's methodology. *Second*, the Commission did not make clear which version of *TVStudy* it intends to use in the incentive auction—indeed, Commission staff continues to release updated versions of *TVStudy*—thus precluding meaningful notice and comment by interested parties. *Third*, the Commission utterly failed to consider reasonable alternatives to *TVStudy*. NAB objected to each of these actions as arbitrary and capricious.

The Order was published in the *Federal Register* on August 15, 2014. NAB filed a petition for review with this Court three days later, on August 18, 2014. NAB challenges the Rule under the Spectrum Act, Pub. L. 112-96, 126 Stat. 156 (codified at 47 U.S.C. § 1401 *et seq.*), and the APA, 5 U.S.C. § 706(2). The Commission plans to conduct the auction in mid-2015. *See* Order ¶ 255 n.782.

## ARGUMENT

Expedited consideration is appropriate here because the Order is "subject to substantial challenge," and "delay will cause irreparable injury" to NAB's members. U.S. Court of Appeals for the D.C. Circuit, *Handbook of Practice and Internal Procedures* 33 (2013). In addition, the Court should grant expedition because auction participants not before the Court, as well as the public generally, have an "unusual interest in prompt disposition" of this petition. *Ibid.*

## I.     The Commission's Decision Is Subject To Substantial Challenge.

The Commission's actions contravene the plain text of the Spectrum Act, and constitute arbitrary and capricious agency action in violation of the APA.

**A.**  It is well established that deference "to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000); *see also Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984).  In this case, however, the statute is unambiguous: In specifying that the Commission "shall make all reasonable efforts" to "preserve," as of February 22, 2012, each broadcaster's "coverage area and population served," "as determined using the methodology described in OET Bulletin 69," Section 1452(b)(2) leaves no relevant statutory gap for the Commission to fill.

Despite that plain language, the Commission departed from this statutory mandate in at least three ways.

*First*, the Commission has stated that it will preserve only "the coverage area of a station to the degree that the area is populated."  Order ¶ 114 n.372.  The Spectrum Act, however, directs the Commission to preserve each broadcaster's "coverage area *and* population served."  47 U.S.C. § 1452(b)(2) (emphasis added).  By preserving only populated areas within the broadcaster's contour, the Commission

has effectively read "coverage area" out of the statute's preservation mandate.  *See*, *e.g.*, Order ¶ 451 n.1303 (acknowledging only the requirement of preserving broadcasters' population served in the repacking); *see also Incentive Auction Task Force Seeks Comment on Staff Analysis Regarding Pairwise Approach To Preserving Population Served*, 79 Fed. Reg. 37,705 (July 2, 2014).  Not only should the Commission preserve both populations served and coverage areas because Congress required it, but preserving coverage area is also important because population in a given area may move to previously unpopulated areas.  *See*, *e.g.*, Order ¶ 148.  The Commission's approach also ultimately undermines broadcasters' rights to serve rural sites within existing coverage areas, is inconsistent with the methodology described in OET Bulletin 69, and deprives each broadcaster of its right to reach its *full* coverage area as of February 22, 2012.

Second, the Commission has decided to "update" the computer program and data described in OET Bulletin 69 on the ground that inputs (*i.e.*, data sources) and computer programs are not part of the "methodology" and can be changed at will.  Order ¶ 134.  This Court's decisions indicate otherwise.  *See*, *e.g.*, *City of Idaho Falls v. FERC*, 629 F.3d 222, 225 (D.C. Cir. 2011) ("The *methodology* the [agencies] used to set rates in this revised schedule differed in several significant ways from their previous methodology, *with each input in the agencies' calculation formula changing in some respect*." (emphases added)).  Moreover, the Commission

itself agrees that "methodology" is "the processes, techniques, or approaches employed in the solution of a problem or in doing something: a particular procedure or set of procedures," Order ¶ 134 & n.436 (quoting *Webster's Third New Int'l Dictionary of the English Language Unabridged* 1423 (1976))—a definition that encompasses the processes, techniques, and approaches "described" in OET Bulletin 69 that the Commission now purports to change, including:

*Station-specific grid*.  In its "Evaluation Procedure," the Bulletin calls for building a "coordinate box" around each broadcast station that "is divided into square cells . . . which should be 2 km on a side or smaller."  OET Bulletin 69, at 11.  In the Commission's new computer program, however, the Commission replaces each "station-specific grid" with "a single, common grid of cells common to all television stations."  Order ¶¶ 131-132.

*Terrain data*.  Noting that "terrain elevation data . . . must be provided," the Bulletin explains that the Commission's computer program "is linked to a terrain elevation database with values every 3 arc-seconds of latitude and longitude." OET Bulletin 69, at 6.  For the incentive auction, however, the Commission will substitute data with a resolution of one arc-second.  Order ¶ 150 & n.500.

*Computer program*.  The Bulletin cites "[c]omputer code for the Longley-Rice point-to-point radio propagation model," which was "referred to as Version 1.2.2 of the Longley-Rice model" and was "used by the FCC for its evaluations."

11

OET Bulletin 69, at 1.  Now the Commission plans to use a new program, with different code, languages, and compilation techniques.  *See* Order ¶¶ 131 n.427, 132 & n.430, 135 n.441; *see also* FCC Public Notice DA 13-138, at 3.

*Population data*.  While the Bulletin states that the coordinates and population of census blocks "are retrieved," OET Bulletin 69, at 11, a 2008 Commission rulemaking "revise[d] the OET 69 interference analysis methodology" by "adopt[ing] the use of 2000 census data" through a notice-and-comment rulemaking.  *Third Periodic Review of the Commission's Rules and Policies Affecting the Conversion to Digital Television*, 73 Fed. Reg. 5634, 5668-69 (Jan. 30, 2008).  Accordingly, the data used in conjunction with the OET Bulletin 69 software as of February 22, 2012, was 2000 census data.  For the auction, the Commission intends to substitute 2010 census data.  *See* Order ¶ 148.

*Other changes*.  The other processes, techniques, and approaches that the Commission seeks to change—including the calculation of depression angles, the antenna beam tilt values, and the precision of geographic coordinates—are all part of Version 1.2.2, the computer program discussed and incorporated in the Bulletin.  *See* Order ¶¶ 153, 155-157.  As the Commission admits, "OET-69 specifically states that a computer program is necessary to implement the methodology."  *Id.* ¶ 127; *see also id.* ¶ 135; OET Bulletin 69, at 1.  Now, however, the Commission intends to "update" the program to do away with many of these procedures.

By altering the data and processes set forth in OET Bulletin 69 for assessing terrain, population, and interference, each of these changes will have substantial implications for the coverage area and population served for broadcast licensees.

*Third*, the Commission has decided not to protect fill-in translators. Broadcasters use fill-in translators to reach their full coverage areas and populations, particularly where terrain disrupts the main broadcast signal. NAB does not contend that translators have independent rights (such as the right to participate in the auction or receive reimbursement for forced relocation) under the Spectrum Act, but broadcasters surely do. For broadcasters that use fill-in translators, the Commission must preserve the areas and populations served by those translators to fulfill its mandate to preserve broadcasters' coverage areas and populations served. Indeed, the Commission authorized the use of these translators expressly to serve the populations and areas within their broadcasters' designated contours. *See Amendment of Parts 73 and 74 of the Commission's Rules to Establish Rules for Replacement Digital Low Power Television Translator Stations*, Report and Order, 24 FCC Rcd 5931, 5933 (2009). Nevertheless, the Commission has made no allowances for broadcasters who rely on fill-in translators, and thus has not made "all reasonable efforts"—or, indeed, any efforts—to preserve their spectrum rights.

In each of these respects, the Order contravenes the statutory text and erodes the spectrum rights of broadcasters who wish to retain those rights and submit to

the repacking process.  By undermining the protections that Congress put in place for broadcasters, the Order elevates the Commission's desired goal of clearing more spectrum over the statutory guarantee that broadcasters will be held harmless in the auction.  47 U.S.C. § 1452(b)(2).  The Commission's decision is subject to substantial challenge under the Spectrum Act.

**B.**  The Commission's adoption of *TVStudy* is also contrary to the APA in several respects.  For example, the Commission's 2012 notice of proposed rule-making gave no indication that *TVStudy* or other changes to the OET Bulletin 69 methodology were under consideration.  Only after public comments were in did the Staff announce, via Public Notice, that it would be substituting *TVStudy* for the OET Bulletin 69 methodology in the repacking.  FCC Public Notice DA 13-138, at 1.  Thus, contrary to settled requirements for APA rulemakings, the new software and other changes were not "logical outgrowth[s]" of the proposed rulemaking. *See Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

Moreover, even after formally adopting *TVStudy*, the Commission has declined to make clear what version of *TVStudy* it will use in the auction, thus precluding meaningful notice and comment.  *See* Order ¶ 145.  The Commission's action continues a pattern initiated by Commission staff, which has repeatedly modified *TVStudy* by posting new versions to a "listserv" but has provided little transparency into what precisely is being changed, thus forcing commenters to address a

moving and concealed target. Even now, Commission staff continues to revise the software, providing no fixed and final version on which to submit meaningful comment. The APA requires that agencies "reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary so that a genuine interchange occurs rather than allowing an agency to play hunt the peanut with technical information." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236-37 (D.C. Cir. 2008) (internal quotation marks and brackets omitted). The Commission has failed to provide such information here.

The Commission also failed to consider obvious alternatives to *TVStudy* that may have resulted in fewer losses to broadcasters' coverage areas and populations served—an omission that "has led uniformly to reversal." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986); *see also Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983).

## II.   Expedition Is Necessary To Prevent Irreparable Injury To NAB's Members.

The Bureau has committed to conducting the auction in a manner that disregards key statutory protections for broadcasters and risks depriving their viewers of free broadcast television service. A favorable decision by this Court after the auction would either leave broadcasters without any remedy for the injuries inflicted by the Order or force them to bear the costs of a do-over auction that complies with the Spectrum Act. And a decision on the eve of the auction would not leave

broadcasters nor the Commission with adequate time to prepare, thus threatening the success of the auction.

If this Court rules in NAB's favor after the auction occurs, the standard remedy would be to "set aside" the Order and the auction. 5 U.S.C. § 706(2). So far as NAB is aware, however, no court has vacated the results of an FCC auction after it has taken place. If this case followed that pattern, repacked broadcasters could be forced to accept the reduced coverage areas and populations unlawfully imposed by the Order. *See* Decl. of Mark Aitken ("Aitken Decl.") ¶ 6; Decl. of Perry Sook ("Sook Decl.") ¶ 5; Decl. of Dave Folsom ("Raycom Decl.") ¶¶ 4-5. Decreased viewership is an irreparable harm for broadcasters. *See Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 50 (D.D.C. 2013). Moreover, decreased viewership means less advertising revenue. Aitken Decl. ¶ 7; Sook Decl. ¶ 6; Raycom Decl. ¶ 6. That lost revenue cannot be recovered, because Congress barred the Commission from "mak[ing] reimbursements . . . for lost revenues." 47 U.S.C. § 1452(b)(4)(C). Such substantial, unrecoverable economic losses also constitute irreparable harm. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 675 (D.C. Cir. 1985).

Even if this Court were to vacate the results of the auction, broadcasters would have to pay the steep auction expenses twice. *See* Aitken Decl. ¶¶ 5, 8; Sook Decl. ¶¶ 4, 7; Raycom Decl. ¶¶ 4, 7. These costs and expenses would be par-

16

ticularly harmful for the majority of broadcasters that are "small entities" with annual revenues of $14 million or less.  Order, App. B, ¶ 15; *cf.* Sook Decl ¶ 7.  Because these costs would be unrecoverable as well, they amount to irreparable harm.  *See Wis. Gas Co.*, 758 F.2d at 675; *see also CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673 & n.7 (D.C. Cir. 2005); *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam).

Moreover, broadcasters need to know, well in advance of the auction, the population and coverage area that will be protected in repacking so that they can minimize at least two harms to their stations from repacking.

*First*, broadcasters need to conduct outreach to determine which viewers are at risk of disruption and to take timely corrective measures.  Sook Decl. ¶ 9; Raycom Decl. ¶ 9.  Many viewers will lose broadcast service from those licensees that relinquish their spectrum rights, and repacking will introduce new sources of interference.  For example, Nexstar Broadcasting Group reports that the auction "may require viewers to invest in additional equipment or subscription services to continue receiving broadcast television signals."  Nexstar Broad. Grp., Inc., Annual Report 28 (Form 10-K) (Mar. 3, 2014).  Even a small investment may be impossible for low-income families that rely exclusively on broadcast television, and broadcasters need time to develop strategies to maintain service to these populations to the extent possible.  Aitken Decl. ¶ 10; Sook Decl. ¶ 9; Raycom Decl. ¶ 9.

*Second*, broadcasters need to prepare for competitive risks that could attend a new channel assignment. By design, the incentive auction will force remaining broadcasters to "occupy a smaller portion" of the broadcast spectrum. Order ¶ 3. One effect of this reorganization, as Sinclair Broadcast Group has reported, is that "new companies will likely be able to enter our markets to compete with us." Sinclair Broadcasting Group, Inc., Annual Report 36 (Form 10-K) (Mar. 3, 2014). But without knowing the coverage area and population served that the Commission will preserve in repacking, broadcasters cannot anticipate which viewers face the threat of disruption or the extent of new competition likely in the affected markets. Aitken Decl. ¶¶ 4, 9; Sook Decl. ¶¶ 8-9; Raycom Decl. ¶ 8.

Broadcasters' inability to anticipate and counteract these harms from repacking will likely cause them to lose viewers and unrecoverable revenue, which both constitute irreparable harm. *See* Sook Decl. ¶ 9; *see also Wis. Gas Co.*, 758 F.2d at 675; *FilmOn X LLC*, 966 F. Supp. 2d at 50. In addition, when individual broadcast television licensees lose viewership and advertising revenue, broadcast networks are placed at a relative disadvantage in negotiating retransmission consent agreements with cable, satellite, and other telecommunications providers. *See* Sook Decl. ¶ 10; Raycom Decl. ¶ 10; *see also FilmOn X LLC*, 966 F. Supp. 2d at 49-50; *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012). The unrecoverable loss of revenue from retransmis-

sion fees, as well as the corresponding damage to broadcast networks' goodwill with their licensees, is also an irreparable harm. *See FilmOn X LLC*, 966 F. Supp. 2d at 49-50; *see also BarryDriller*, 915 F. Supp. 2d at 1147.

Expediting this case, and deciding it well in advance of the auction, will prevent or mitigate these otherwise irreparable injuries by ensuring that the auction proceeds in a manner consistent with the Spectrum Act and the APA.

## III. The Public And Auction Participants Not Before This Court Have An Interest In The Prompt Disposition Of This Case.

In addition to NAB's members, mobile broadband providers who plan to bid in the forward auction have a strong interest in expedition. Because the incentive auction's three phases are "interdependent," problems in one phase will spill over to the others. *Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, 77 Fed. Reg. 69,934, 69,942 (Nov. 21, 2012). And "whatever approach [is] adopted to preserving population served will have a significant impact on the amount of spectrum available to repurpose for mobile broadband use." *Id.* at 69,946. If the Court issues a decision on the eve of the auction, the substantial preparations of *all* interested parties—broadcasters, the Commission, and wireless providers alike—will be irretrievably lost.

Moreover, as the Commission explained, the public as a whole has a strong interest in a successful incentive auction:

19

> Wireless broadband is now a key component of economic growth, job crea-
> tion and global competitiveness, and the explosive growth of wireless
> broadband services has created increased demand for wireless spectrum.
> Government entities and private industry alike have recognized the urgent
> need for more spectrum for wireless broadband services, and have been
> working to increase the availability of spectrum for these valuable uses.

77 Fed. Reg. at 69,946.  Indeed, Congress—the institution designed to reflect the

public interest—ordered the auction in the first place.

The public also benefits from expedition to protect broadcasters, because

broadcasters serve the public interest.  *See Fla. Inst. of Tech. v. FCC*, 952 F.2d

549, 554 (D.C. Cir. 1992) (recognizing "the public's interest in having broadcast

. . . service provided . . . without undue delay"); *see also* 47 U.S.C. § 309(a).  If the

auction proceeds before this Court decides the legality of the Commission's action,

viewers could lose television service for an indeterminate period of time.

Conversely, expedition harms no one; to the contrary, it accommodates the

schedule the Commission has set.  If the auction occurs before this Court's deci-

sion, and this Court sets aside the results because the Commission miscalculated

coverage areas and populations served, the entire auction will have to be unwound

and repeated.  All parties will bear the unrecoverable costs of bidding in the auc-

tion twice, and the redistribution of spectrum will be delayed.  Expedition here is

thus preferable for everyone, parties and nonparties alike.

## CONCLUSION

For the foregoing reasons, this motion should be granted.

20

Dated:  August 27, 2014                Respectfully submitted,

                                              /s/ Miguel A. Estrada

Rick Kaplan                            Miguel A. Estrada
Jane E. Mago                             *Counsel of Record*
NATIONAL ASSOCIATION OF                Scott P. Martin
   BROADCASTERS                      Lucas C. Townsend
1771 N Street, N.W.                    Ashley S. Boizelle
Washington, D.C.  20036                GIBSON, DUNN & CRUTCHER LLP
(202) 429-5430                         1050 Connecticut Ave., N.W.
                                       Washington, D.C.  20036
*Counsel for the National Association of*   (202) 955-8500
*Broadcasters*

                                       *Counsel for the National Association of*
                                       *Broadcasters*

# DECLARATIONS

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF
BROADCASTERS,

                 Petitioner,

     v.

FEDERAL COMMUNICATIONS
COMMISSION and UNITED STATES OF
AMERICA,

               Respondents.

No. 14-1154

## DECLARATION OF MARK A. AITKEN IN SUPPORT OF EMERGENCY MOTION BY THE NATIONAL ASSOCIATION OF BROADCASTERS FOR EXPEDITED CONSIDERATION OF PETITION FOR REVIEW AND AN EXPEDITED BRIEFING SCHEDULE

1.     I, Mark A. Aitken, am the Vice President of Advanced Technology of Sinclair Broadcast Group, Inc. ("Sinclair"). My responsibilities include planning for the FCC's broadcast incentive auction and evaluating the impact of the auction and re-packing on television stations licensed to subsidiaries of Sinclair. The following is within my personal knowledge, and, if called and sworn as a witness, I could and would competently testify thereto.

2.     Sinclair is a member of the National Association of Broadcasters. Sinclair, through its subsidiaries, currently holds licenses issued by the Federal

Communications Commission ("FCC") that confer broadcast television spectrum usage rights.

3. Sinclair has a substantial interest in obtaining an expedited decision by this Court regarding the validity of the new methodology adopted by the Federal Communications Commission ("FCC") for determining coverage area and population served in order to preserve those values in the repacking of broadcast spectrum pursuant to the FCC's incentive auction.

4. As explained below, the FCC's new methodology produces reduced values for many of Sinclair's television stations' coverage area and population served. Sinclair has been particularly diligent over several decades in working to improve and extend over-the-air coverage area and population served by its television stations. That work has required substantial and ongoing investments, totaling in the many tens of millions of dollars over the years (hundreds of millions if including the transition and upgrade to digital). Greater over-the-air coverage results in greater viewership and greater revenue for our stations. But, critically, Sinclair is also investing millions of dollars currently in development of new broadcast technologies that will enable new and enhanced television services. Sinclair's plans for deployment of those technologies depend on the coverage area the FCC permits for each of its television stations. Uncertainty arising from the FCC's changes to OET-69 will delay those plans and is therefore likely to delay

introduction of new and enhanced services that that will allow Sinclair to better compete.

5.    Loss of coverage area and population served through the FCC's repacking process will lead to decreased viewership and decreased revenue.  Even if the auction results were subsequently vacated by this Court, Sinclair will be harmed in the interim.  Because there are significant costs associated with being repacked, Sinclair will bear the burden of paying such costs twice.  The risk of substantial coverage area loss would also complicate, and delay, Sinclair's introduction of new and enhanced services.

### Reduced Coverage Area and Population Served

6.    As compared with the version of OET Bulletin No. 69 that applied until the FCC order at issue in this case, the methodology adopted by the FCC in the order published at 79 Fed. Reg. 48,442 calculates reductions in coverage area and population served for ten or more of Sinclair's broadcast television stations, with losses of up to 8.6 percent of coverage area and 4.8 percent of population served on an individual station basis.  Sinclair can only conclude that, following the channel reassignment and repacking process, those reductions will lead to fewer viewers.

7.    Fewer viewers means less revenue for Sinclair, and a less competitive position within the local markets we serve.  For a broadcaster like Sinclair,

3

advertising is the principal source of revenue.  And the primary determinant of advertising revenue is the number of viewers.

## Auction Preparation and Expenses

8.     Sinclair estimates that it will spend one million or more dollars to prepare for the auction.  Before the auction, for example, Sinclair plans to evaluate the potential impact of the auction on each of the 162 television stations it owns or provides services to, undertake scenario planning for each case, budget for potential costs, and work with suppliers to the extent possible to arrange for equipment and services that may be required.   If the auction is initially held pursuant to the parameters set forth in the FCC's order, and that auction is vacated by this Court, Sinclair will have to bear those same auction expenses a second time.  Such costs will include the costs associated with preparing for (and adapting to) any repacking.

9.     In order to prepare for new competitive risks that will attend the incentive auction for those broadcasters that are repacked, Sinclair needs to know how much of its protected population and coverage area will remain and be protected well in advance of the auction.

10.     As a result of the repacking process, some viewers may need to invest in new equipment or subscription services to continue receiving broadcast television signals.  But the burden and expense of these investments may be too

great for many low-income families that rely exclusively on over-the-air broadcast television.  In order to determine which viewers are most at risk of having their broadcast television service disrupted by repacking, and to develop strategies to maintain service to these populations where possible, Sinclair needs advance notice of the protected population served and coverage area.  Disruption of service to viewers will mean lower viewership for Sinclair, which (as explained above) means lower revenue.  In addition, many viewers will likely blame Sinclair for the service disruption, damaging Sinclair's goodwill.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.


Executed this 25th day of August, 2014, at Hunt Valley, Maryland.


_Mark A. Aitken_
Mark A. Aitken

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF BROADCASTERS, | |
| Petitioner, | No. |
| v. | |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, | |
| Respondents. | |

**DECLARATION OF PERRY SOOK IN SUPPORT OF
EMERGENCY MOTION BY THE NATIONAL ASSOCIATION OF
BROADCASTERS FOR EXPEDITED CONSIDERATION OF PETITION
FOR REVIEW AND AN EXPEDITED BRIEFING SCHEDULE**

1.      I am the Chief Executive Officer, President and Chairman of the Board of Nexstar Broadcasting, Inc.  The following is within my personal knowledge, and, if called and sworn as a witness, I could and would competently testify thereto.

2.      Nexstar Broadcasting, Inc. ("Nexstar") is a member of the National Association of Broadcasters.  Nexstar currently holds broadcast television spectrum usage rights.

3.    Nexstar has a substantial interest in obtaining an expedited decision by this Court regarding the validity of the new methodology adopted by the Federal Communications Commission ("FCC") for determining coverage area and population served by its television stations in order to preserve those values in the repacking of broadcast spectrum pursuant to the FCC's incentive auction.

4.    As explained below, the FCC's new methodology produces reduced values for Nexstar's stations coverage area and population served.  Those reductions will lead to decreased viewership and decreased revenue, and in once instance, will cause the station to become wholly unviable.  Even if the auction results are subsequently vacated by this Court, Nexstar will be harmed in the interim.  Because there are significant costs associated either with being repacked or with winding down a business in order to participate in the reverse auction, Nexstar will bear the burden of paying such costs twice—whether or not it chooses to participate in the reverse auction.

## Reduced Coverage Area and Population Served

5.    As compared with the version of OET Bulletin No. 69 that applied until the FCC order at issue in this case, the methodology adopted by the FCC in the order published at 79 Fed. Reg. 48,442 predicts reductions in coverage area and population served for one of Nexstar's broadcast television stations, with losses of 1.1 percent of coverage area and 3.6 percent of population served; and for another,

will result in a 97.8 percent population loss – essentially, the loss of nearly its entire population served.  Nexstar estimates that, following the channel reassignment and repacking process, those reductions will lead to fewer viewers.

6.     Fewer viewers means less revenue for Nexstar.  For a broadcaster like Nexstar, advertising is the principal source of revenue.  And the primary determinant of advertising revenue is the number of viewers.

### Auction Expenses

7.     Nexstar estimates that it will spend approximately $200,000-250,000 to prepare for the auction.  Before the auction, for example, Nexstar plans to engage engineering consultants to conduct a complete, independent review of the auction and repacking impact on its television stations; work with an expert in spectrum valuation to determine Nexstar's strategy for participation or non-participation in the auction; and engage legal services as necessary.  If the auction is initially held pursuant to the parameters set forth in the FCC's order, and that auction is vacated by this Court, Nexstar will have to bear those same auction expenses a second time.  Such costs will include either the costs associated with winding down business in order to participate in the reverse auction or the cost of preparing for (and adapting to) any repacking.

### Preparation for Auction

8.     In order to either prepare to wind down its business to relinquish spectrum in the reverse auction or prepare for new competitive risks that will attend the incentive auction for those broadcasters that are repacked, Nexstar needs to know how much of its protected population and coverage area will remain and be protected well in advance of the auction.

9.     As a result of the repacking process, some viewers may need to invest in new equipment or subscription services to continue receiving broadcast television signals.  But the burden and expense of these investments may be too great for many low-income families that rely exclusively on over-the-air broadcast television.  In order to determine which viewers are most at risk of having their broadcast television service disrupted by repacking, and to develop strategies to maintain service to these populations where possible, Nexstar needs advance notice of the protected population served and coverage area.  Disruption of service to viewers will mean lower viewership for Nexstar, which (as explained above) means lower revenue.  In addition, many viewers will likely blame Nexstar for the service disruption, damaging Nexstar's goodwill.

10.     When Nexstar loses viewership and advertising revenue for its original broadcasts, it also is disadvantaged in negotiating retransmission consent

agreements with cable, satellite, and other telecommunications providers. As a result, Nexstar's revenue from retransmission fees will also decrease.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed this 25th day of August, 2014.

Perry A. Sook

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NATIONAL ASSOCIATION OF
BROADCASTERS,

              Petitioner,

     v.

FEDERAL COMMUNICATIONS
COMMISSION and UNITED STATES OF
AMERICA,

              Respondents.

No.

**DECLARATION OF RAYCOM MEDIA, INC. IN SUPPORT OF
EMERGENCY MOTION
BY THE NATIONAL ASSOCIATION OF BROADCASTERS
FOR EXPEDITED CONSIDERATION OF PETITION FOR REVIEW AND
AN EXPEDITED BRIEFING SCHEDULE**

1.    I am the Chief Technology Officer of Raycom Media, Inc.
("Raycom"). My job responsibilities include the engineering, installation and
support of transmission facilities for the Raycom stations. The following is within
my personal knowledge, and, if called and sworn as a witness, I could and would
competently testify thereto.

2.      Raycom is a member of the National Association of Broadcasters. Raycom currently holds broadcast television spectrum usage rights.

3.      Raycom has a substantial interest in obtaining an expedited decision by this Court regarding the validity of the new methodology adopted by the Federal Communications Commission ("FCC") for determining coverage area and population served in order to preserve those values in the repacking of broadcast spectrum pursuant to the FCC's incentive auction.

4.      As explained below, the FCC's new methodology produces reduced values for Raycom's coverage area and population served.  Those reductions will lead to decreased viewership and decreased revenue.  Even if the auction results were subsequently vacated by this Court, Raycom will be harmed in the interim. Because there are significant costs associated either with being repacked or with winding down a business in order to participate in the reverse auction, Raycom will bear the burden of paying such costs twice—whether or not it chooses to participate in the reverse auction.

**Reduced Coverage Area and Population Served**

5.     As compared with the version of OET Bulletin No. 69 that applied until the FCC order at issue in this case, the methodology adopted by the FCC in the order published at 79 Fed. Reg. 48,442 predicts reductions in coverage area and population served for two of Raycom's broadcast television stations, with losses of up to 10.6 percent of coverage area and 4.7 percent of population served.  Raycom estimates that, following the channel reassignment and repacking process, those reductions will lead to fewer viewers.

6.     Fewer viewers means less revenue for Raycom.  For a broadcaster like Raycom, advertising is the principal source of revenue.  And the primary determinant of advertising revenue is the number of viewers.

**Auction Expenses**

7.     Raycom estimates that it will spend $500,000 to prepare for the auction.  Before the auction, for example, Raycom plans to prepare coverage studies and interference scenarios.  If the auction is initially held pursuant to the parameters set forth in the FCC's order, and that auction is vacated by this Court, Raycom will have to bear those same auction expenses a second time.  Such costs will include either the costs associated with winding down business in order to

participate in the reverse auction or the cost of preparing for (and adapting to) any repacking.

### Preparation for Auction

8.     In order to either prepare to wind down its business to relinquish spectrum in the reverse auction or prepare for new competitive risks that will attend the incentive auction for those broadcasters that are repacked, Raycom needs to know how much of its protected population and coverage area will remain and be protected well in advance of the auction.

9.     As a result of the repacking process, some viewers may need to invest in new equipment or subscription services to continue receiving broadcast television signals.  But the burden and expense of these investments may be too great for many low-income families that rely exclusively on over-the-air broadcast television.  In order to determine which viewers are most at risk of having their broadcast television service disrupted by repacking, and to develop strategies to maintain service to these populations where possible, Raycom needs advance notice of the protected population served and coverage area.  Disruption of service to viewers will mean lower viewership for Raycom, which (as explained above)

means lower revenue. In addition, many viewers will likely blame Raycom for the service disruption, damaging Raycom's goodwill.

10.     When Raycom loses viewership and advertising revenue for its original broadcasts, it also is disadvantaged in negotiating retransmission consent agreements with cable, satellite, and other telecommunications providers. As a result, Raycom's revenue from retransmission fees will also decrease.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed this 22nd day of August, 2014, in Montgomery, Alabama

Dave Folsom
Chief Technology Officer
Raycom Media, Inc.

## PROVISIONAL   CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner states as follows:

**(A)**  **Parties and Amici:**

The parties in this case are Petitioner the National Association of Broadcast-ers and Respondents the Federal Communication Commission and the United States of America.

**(B)**  **Rulings Under Review:**

The National Association of Broadcasters seeks review of the Federal Communication Commission's order captioned Expanding the Economic and In-novation Opportunities of Spectrum Through Incentive Auctions, FCC 14-50, GN Docket No. 12-268 (rel. June 2, 2014).  A summary of that order was published in the Federal Register at 79 Fed. Reg. 48,442 (Aug. 15, 2014).

**(C)**  **Related Cases:**

The National Association of Broadcasters is not aware of any cases related to this petition for review.

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of August, 2014, I caused the foregoing Emergency Motion to Expedite to be filed with the Clerk of Court for the United States Court of Appeals for the D.C. Circuit using the appellate CM/ECF system.  I also hereby certify that I caused four copies to be hand delivered to the Clerk's Office.

I further certify that I caused the foregoing Emergency Motion to Expedite to be served on counsel for all parties by the CM/ECF system.

  /s/ Lucas C. Townsend
Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
(202) 955-8500