No. 14-1154 (consolidated with Nos. 14-1179 and 14-1218)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF BROADCASTERS, *et al.*,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

CTIA—THE WIRELESS ASSOCIATION, *et al.*,

*Intervenors for Respondents.*

On Petitions For Review Of Final Rules Of The
United States Federal Communications Commission

## JOINT OPENING BRIEF FOR PETITIONERS
## NATIONAL ASSOCIATION OF BROADCASTERS AND
## SINCLAIR BROADCASTING GROUP, INC.

Rick Kaplan
Jerianne Timmerman
Patrick McFadden
NATIONAL ASSOCIATION OF
BROADCASTERS
1771 N Street, N.W.
Washington, D.C.  20036
Telephone:  (202) 429-5430

Miguel A. Estrada
  *Counsel of Record*
Scott P. Martin
Lucas C. Townsend
Ashley S. Boizelle
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
MEstrada@gibsondunn.com

*Counsel for Petitioner National Association of Broadcasters*

[*continued on inside cover*]

John K. Hane
  *Counsel of Record*
Jeetander T. Dulani
Cynthia Cook Robertson
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
2300 N. Street, N.W.
Washington, D.C.  20037
Telephone:  (202) 663-8116
john.hane@pillsburylaw.com

*Counsel for Petitioner Sinclair Broadcast Group, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners state as follows:

**(A)    Parties and Amici:**

The parties in this Court's case no. 14-1154 are Petitioner the National Association of Broadcasters ("NAB"); Respondents the Federal Communications Commission ("FCC" or "Commission") and the United States of America; and Intervenors CTIA—The Wireless Association, Competitive Carriers Association, and Consumer Electronics Association.

The parties in this Court's case no. 14-1179 are Petitioner Sinclair Broadcast Group, Inc. ("Sinclair"); Respondents the FCC and the United States of America; and Intervenor Expanding Opportunities for Broadcasters Coalition.

The parties in this Court's case no. 14-1218 are Petitioner NAB and Respondents the FCC and the United States of America.

**(B)    Rulings Under Review:**

NAB and Sinclair (collectively, "Petitioners") seek review of the Commission's order captioned, *Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, FCC 14-50, GN Docket No. 12-268 (rel. June 2, 2014) ("Order"), JA__.  A summary of that order was published in the Federal Register at 79 Fed. Reg. 48,442 (Aug. 15, 2014).  *See* JA__.

**(C)    Related Cases:**

The petition filed in *Sinclair Broadcast Group, Inc. v. FCC*, No. 14-1179 (Sept. 15, 2014), was consolidated with this case on September 19, 2014.  On October 29, 2014, NAB filed a second petition concerning a related order of the Commission captioned *Expanding the Economic and Innovative Opportunities of Spectrum Through Incentive Auctions*, Declaratory Ruling, GN Dkt. No. 12-268 (rel. September 30, 2014) ("Declaratory Ruling"), JA__.  *See* No. 14-1218 (filed Oct. 29, 2014).  That challenge was consolidated with this action on October 31, 2014.  Petitioners are not aware of any other cases related to this petition for review.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1, Petitioners National Association of Broadcasters ("NAB") and Sinclair Broadcast Group, Inc. ("Sinclair") state as follows:

NAB is a nonprofit, incorporated association of radio and television stations. It has no parent company, and has not issued any shares or debt securities to the public; thus no publicly held company owns ten percent or more of its stock.  As a continuing association of numerous organizations operated for the purpose of promoting the interests of its membership, the coalition is a trade association for purposes of D.C. Circuit Rule 26.1.

Sinclair is a Maryland corporation that is publicly traded on the NASDAQ Stock Exchange [NASDAQ:  SBGI].  Sinclair operates and provides programming and sales services to television stations in various cities across the country.  Sinclair has no parent company and no publicly traded company owns more than 10 percent of Sinclair's stock.

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

JURISDICTIONAL STATEMENT .......................................................................5

STATEMENT OF THE ISSUES............................................................................6

STATUTES AND REGULATIONS.......................................................................8

STATEMENT OF THE CASE...............................................................................8

      A.     The Spectrum Act ..........................................................8

      B.     OET Bulletin 69 .............................................................9

      C.     The Rulemaking Process...............................................12

            1.     The Proposed Rule..........................................12

            2.     *TVStudy* ........................................................13

            3.     Widelity Repacking Report .............................16

      D.     The Final Rule...............................................................17

STANDARD OF REVIEW ..................................................................................22

SUMMARY OF ARGUMENT .............................................................................23

STANDING ..........................................................................................................30

      A.     NAB ..............................................................................30

      B.     Sinclair .........................................................................31

ARGUMENT ........................................................................................................33

    I.     The Commission's Rule Violates The Spectrum Act .........................33

# TABLE OF CONTENTS
## (continued)

Page

A.   The Spectrum Act Directs The FCC To Use The Methodology Described In OET Bulletin 69, Not *TVStudy* ...................................................................34

    1.   The Spectrum Act Unambiguously Forecloses *TVStudy* ...........................................................34

    2.   The FCC's Hunt For Ambiguity Comes Up Short ........37

    3.   The FCC Misconstrued The Statute's Preservation Mandate. .......................................................48

B.   The FCC Has Not Made All Reasonable Efforts To Preserve All Populations Served...............................50

C.   The FCC Has Not Made All Reasonable Efforts To Preserve All Coverage Areas, Including Unpopulated Ones...................................................................51

D.   The FCC Failed To Protect Facilities That Licensees Use To Serve Viewers ....................................................54

II.   The Commission's Order Violates The APA......................................57

A.   The FCC Failed To Consider Reasonable Alternatives............57

B.   The FCC Failed To Provide A Reasoned Explanation For Its Refusal To Preserve Population Served And Coverage Area ...................................................................60

C.   The Rule Violated The APA's Notice Requirements...............62

III.   The Commission's Order Also Violates The Spectrum Act And The APA On Two Additional Grounds ...............................................65

# TABLE OF CONTENTS
(continued)

Page

A.   The Commission's Rule Requiring Broadcasters To Cease  Operations On Pre-Auction Channels Within 39 Months  Following Reassignment Is Arbitrary And Capricious And Violates The FCC's Statutory Obligations ................................................................................66

1.   The 39-Month "Go-Dark" Requirement Conflicts With Unrebutted Record Evidence ................................67

2.   The FCC Ignored Its Statutory Obligation To Protect  Displaced Broadcasters And Justified Its Decision By Relying On Factors That Congress Did Not Intend It To Consider .......................................72

B.   The Commission's Determination That The Existence Of Any Two Qualified Bidders Satisfies The Spectrum Act Is Inconsistent With The Spectrum Act And Violates The APA ...................................................................................75

1.   The FCC's Interpretation Of The "Two Competing Licensees" Requirement Is Contrary To The Plain Language Of The Spectrum Act ....................................75

2.   The FCC's Rule Is Arbitrary And Capricious Because The FCC Relies On Inappropriate Factors, Offers An  Implausible Explanation, And Is Internally Inconsistent ................................................79

IV.   The Order's Deficiencies Require Vacatur ........................................81

CONCLUSION .......................................................................................82

# TABLE OF AUTHORITIES

Page(s)

*Authorities upon which we chiefly rely are marked with an asterisk.

**Cases**

*Allied Local & Reg'l Mfrs. Caucus v. EPA,*
  215 F.3d 61 (D.C. Cir. 2000) ................................................................ 23

*Allied-Signal, Inc. v. NRC,*
  988 F.2d 146 (D.C. Cir. 1993) ............................................................. 81

*Alvin Lou Media, Inc. v. FCC,*
  571 F.3d 1 (D.C. Cir. 2009) ................................................................. 32

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ........................................................... 81

*\*Am. Library Ass'n v. FCC,*
  406 F.3d 689 (D.C. Cir. 2005) .......................................... 22, 67, 73, 79

*Am. Radio Relay League, Inc. v. FCC,*
  524 F.3d 227 (D.C. Cir. 2008) ............................................................. 62

*Arizona v. Thompson,*
  281 F.3d 248 (D.C. Cir. 2002) ............................................................. 48

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) ........................................................... 67

*\*Chevron U.S.A. Inc. v. NRDC,*
  467 U.S. 837 (1984) ..................................................................... 22, 79

*Christopher v. SmithKline Beecham Corp.,*
  132 S. Ct. 2156 (2012) ................................................................. 27, 59

*City of Brookings Mun. Tel. Co. v. FCC,*
  822 F.2d 1153 (D.C. Cir. 1987) ........................................................... 57

*\*City of Idaho Falls, Idaho v. FERC,*
  629 F.3d 222 (D.C. Cir. 2011) ....................................................... 42, 43

*Covad Commc'ns Co. v. FCC,*
  450 F.3d 528 (D.C. Cir. 2006) ............................................................. 23

*Dep't of the Treasury v. Fed. Labor Relations Auth.,*
  739 F.3d 13 (D.C. Cir. 2014) ........................................................ 74, 80

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*DIRECTV, Inc. v. FCC*,
110 F.3d 816 (D.C. Cir. 1997) ..................................................32

*Dow Agrosciences LLC v. Nat'l Marine Fisheries Serv.*,
707 F.3d 462 (4th Cir. 2013)....................................................46

*Envtl. Integrity Project v. EPA*,
425 F.3d 992 (D.C. Cir. 2005) ..................................................62

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ..................................................................22

*High Plains Wireless, L.P. v. FCC*,
276 F.3d 599 (D.C. Cir. 2002) ........................................... 32, 33

*Hunt v. Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977)..................................................................30

*Judulang v. Holder*,
132 S. Ct. 476 (2011) ......................................................... 59, 60

*Kooritzky v. Reich*,
17 F.3d 1509 (D.C. Cir. 1994) ..................................................63

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*,
741 F.3d 1309 (D.C. Cir. 2014) ................................................71

*Loving v. IRS*,
742 F.3d 1013 (D.C. Cir. 2014) ................................................51

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)..................................................................31

*McElroy Electronics Corp. v. FCC*,
990 F.2d 1351 (D.C. Cir. 1993) ................................................62

*Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................. 23, 57

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005)..................................................................22

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) ................................................81

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ..................................................57

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*NRDC v. Daley*,
   209 F.3d 747 (D.C. Cir. 2000) .......................................................76

*NRDC v. EPA*,
   489 F.3d 1250 (D.C. Cir. 2007) ....................................................81

*Oceana, Inc. v. Locke*,
   670 F.3d 1238 (D.C. Cir. 2011) ............................................. 74, 80

*PDK Labs. Inc. v. DEA*,
   362 F.3d 786 (D.C. Cir. 2004) .....................................................48

*Qwest Corp. v. FCC*,
   258 F.3d 1191 (10th Cir. 2001) ...................................................43

*Rodriguez v. United States*,
   480 U.S. 522 (1987) ....................................................................34

*Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*,
   29 F.3d 655 (D.C. Cir. 1994) ......................................................34

*\*Sandifer v. U.S. Steel Corp.*,
   134 S. Ct. 870 (2014) ................................................. 49, 72, 74, 80

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) .....................................................30

*\*Sorenson Commc'ns Inc. v. FCC*,
   755 F.3d 702 (D.C. Cir. 2014) ........................... 23, 67, 72, 75, 81

*Sprint Corp. v. FCC*,
   315 F.3d 369 (D.C. Cir. 2003) ............................................. 63, 64

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
   749 F.2d 788 (D.C. Cir. 1984) ............................................. 26, 57

**Statutes**

5 U.S.C. § 553 ...............................................................................62

5 U.S.C. § 706(2) ................................................................ 22, 74, 81

28 U.S.C. § 2342(1) .........................................................................5

28 U.S.C. § 2344 ..............................................................................5

47 U.S.C. § 309(j) ..........................................................................78

## TABLE OF AUTHORITIES
(continued)

Page(s)

47 U.S.C. § 309(j)(8)(G)...................................................................79

47 U.S.C. § 309(j)(8)(G)(i)...............................................................76

*47 U.S.C. § 309(j)(8)(G)(ii) ................................................. 4, 8, 29, 75

47 U.S.C. § 316(a) ...........................................................................65

47 U.S.C. § 402(a) .............................................................................5

47 U.S.C. § 1401(6) ..........................................................................55

47 U.S.C. § 1451(b)(1) ......................................................................72

47 U.S.C. § 1452 ................................................................................8

47 U.S.C. § 1452(a)(1) ............................................................... 1, 2, 8

47 U.S.C. § 1452(b)(1)(B) ...................................................................9

*47 U.S.C. § 1452(b)(2) ........................................ 1, 2, 6, 7, 9, 24, 25, 29, 34, 35,
36, 47, 51, 52, 55, 58, 62, 66, 78

47 U.S.C. § 1452(c) ............................................................................9

47 U.S.C. § 1452(f)(3) ................................................................ 66, 72

47 U.S.C. § 1452(f)(3) ......................................................................57

47 U.S.C. § 1452(h) ..........................................................................66

### Rules and Regulations

47 C.F.R. § 73.616(e)(1) ....................................................................45

47 C.F.R. § 73.622(e) ................................................................. 60, 61

47 C.F.R. § 73.683 .............................................................................10

47 C.F.R. § 73.683(a) .........................................................................10

47 C.F.R. § 74.701(a) .........................................................................12

FED. R. OF APP. P. 15(a) ....................................................................5, 6

# TABLE OF AUTHORITIES
### (continued)

Page(s)

**Other Authorities**

158 Cong. Rec. E237-38
(daily ed. Feb. 24, 2012) ....................................................................79

Advanced Television Sys. Comm., Inc.,
*ATSC-Mobile DTV Standard, Part 1 – ATSC Mobile Digital*
*Television System* (2011),
http://www.atsc.org/cms/standards/a153/a_153-Part-1-2011.pdf ......................52

*Amendment of Parts 73 & 74 of the Commission's Rules to*
*Establish Rules for Digital Low Power Television*, Report and Order,
19 FCC Rcd 19331 (2004) .............................................. 12, 13, 54, 56

*In re Amendment of the Commission's Rules Related to*
*Retransmission Consent*, Report and Order and Further Proposed Rulemaking,
29 FCC Rcd 3351 (2014) ....................................................................77

*Auction of 700 MHz Band Licenses Scheduled for January 16, 2008*,
FCC Public Notice, DA 07-3415,
AU Docket No. 07-157 (rel. Aug. 17, 2007) ..........................................76

*Expanding the Economic and Innovation Opportunities of*
*Spectrum Through Incentive Auctions*,
77 Fed. Reg. 69,934 (Nov. 21, 2012)............................................ 12, 63

*Expanding the Economic and Innovation Opportunities of*
*Spectrum Through Incentive Auctions*,
79 Fed. Reg. 48,442 (Aug. 15, 2014)............................................. 5, 20

FCC, *2010 National Broadband Plan: Broadband Action Agenda*,
http://www.broadband.gov/plan/broadband-action-agenda.html ......................36

Incentive Auction Task Force Seeks Comment on Staff Analysis Regarding
Pairwise Approach to Preserving Population Served,
79 Fed. Reg. 37,705 (July 2, 2014)......................................................52

*Media Bureau Seeks Comment on Widelity Report and Catalog of Potential*
*Expenses and Estimated Costs*,
79 Fed. Reg. 18,026 (Mar. 31, 2014)....................................................16

# TABLE OF AUTHORITIES
### (continued)

Page(s)

\*OET Bulletin 69, *Longley-Rice Methodology for Evaluating TV Coverage
and Interference* (Feb. 6, 2004) ..................... 2, 6, 7, 9, 10, 11, 14, 15, 21, 24, 28,
33, 35, 36, 37, 38, 40, 42, 45, 46, 47
48, 49, 50, 54, 58, 59, 61, 64, 82

*Office of Engineering and Technology Releases and Seeks Comment on
Updated OET-69 Software* 1, FCC Public Notice DA 13-138,
ET Docket No. 13-26 (rel. Feb. 4, 2013) ...........................................................13

*In re Qualcomm Inc. Petition for Declaratory Ruling*,
21 FCC Rcd. 11683 (2006)..................................................................................44

Third Periodic Review of the Commission's Rules and Policies Affecting the
Conversion to Digital Television (Third Periodic Review),
73 Fed. Reg. 5634 (Jan. 30, 2008) ................................................................. 40, 44

*Webster's Third New International Dictionary of the
English Language Unabridged* (1st ed. 1976)....................................................37

\*Widelity, Inc., *Response to the Federal Communications Commission
for the Broadcaster Transition Study Solicitation*,
GN Docket No. 12-268 (Dec. 30, 2013)............................... 16, 18, 29, 68, 69, 71

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Commission or FCC | Federal Communications Commission |
| Declaratory Ruling | *Expanding the Economic and Innovative Opportunities of Spectrum Through Incentive Auctions*, Declaratory Ruling, GN Dkt. No. 12-268 (rel. Sept. 30, 2014) (JA__) |
| First Digital TV Translator Order | *Amendment of Parts 73 & 74 of the Commission's Rules to Establish Rules for Digital Low Power Television*, Report and Order, 19 FCC Rcd 19331 (2004) |
| NAB | National Association of Broadcasters |
| NPRM | Notice of Proposed Rulemaking |
| OET | Office of Engineering and Technology |
| OET Bulletin 69 or Bulletin | OET Bulletin 69, *Longley-Rice Methodology for Evaluating TV Coverage and Interference* (Feb. 6, 2004) (JA__) |
| Order | *Expanding the Economic and Innovative Opportunities of Spectrum Through Incentive Auctions*, Report and Order, GN Dkt. No. 12-268 (rel. June 2, 2014) (JA__) |
| Sinclair | Sinclair Broadcast Group, Inc. |
| Spectrum Act | Title VI of the Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. 112-96, 126 Stat. 156, 201 (Feb. 22, 2012) |
| Widelity Report | Widelity, Inc., *Response to the Federal Communications Commission for the Broadcaster Transition Study Solicitation*, GN Docket No. 12-268 (Dec. 30, 2013) (JA__) |

## INTRODUCTION

In Title VI of the Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. 112-96, 126 Stat. 156, 201, commonly known as the Spectrum Act, Congress authorized the Federal Communications Commission ("FCC") to conduct an "incentive" auction of broadcast television spectrum, in order to make voluntarily relinquished spectrum available for other uses. These consolidated appeals stem from the FCC's refusal to follow Congress's express direction to protect over-the-air television broadcasters as it conducts the auction.

When authorizing the FCC to conduct the broadcast spectrum incentive auction, Congress plainly sought to balance its desire to reallocate spectrum for commercial wireless service with the goal of ensuring that broadcasters that choose not to participate in the auction—and their viewers—are unharmed in the process. The Spectrum Act provides that broadcasters should retain the same coverage areas (47 U.S.C. § 1452(b)(2)), serve the same viewers (*id.*), and be reimbursed for any costs associated with their forced relocation by the FCC (*id.* § 1452(b)(4)(A)). Congress even went so far as to prescribe the precise method by which the FCC must calculate broadcasters' coverage areas and populations served, to ensure that the Commission creates certainty for broadcasters and does not shrink existing areas of service in an attempt to reclaim more spectrum for the commercial wireless industry.

1

In keeping with these objectives, the Spectrum Act provides that broadcast television licensees may "voluntarily" relinquish their spectrum rights in exchange for compensation. 47 U.S.C. § 1452(a)(1). For broadcasters who retain their rights, "the Commission shall make all reasonable efforts to preserve, as of February 22, 2012, the coverage area and population served of each broadcast television licensee, as determined using the methodology described in OET Bulletin 69 of the Office of Engineering and Technology of the Commission." *Id.* § 1452(b)(2). OET Bulletin 69 has, for more than a decade, set forth the Commission's technical standard for determining the coverage area and population served by each broadcast television licensee.

The FCC has shunned its statutory obligation to protect broadcasters and viewers. In an admitted effort to make as much spectrum as possible available for wireless providers, a deeply divided Commission adopted auction procedures that will fail to preserve either "coverage area" or "population served" for each broadcast television licensee, and will disregard the FCC-authorized facilities needed to preserve the coverage area and population served for many licensees that experience interruptions in their broadcast signal due to interference, terrain, or other factors. More troubling, the Commission replaced the methodology that Congress specified for preserving coverage area and population served—OET Bulletin 69— with a new methodology created by Commission staff and first announced in a

2

2013 public notice.  That new methodology, called *TVStudy*, effectively moves the goalposts by employing dramatically different procedures and producing significantly different calculations of broadcasters' coverage areas and populations served.  As two of the five Commissioners noted in dissents from the Commission's Order, this approach contravenes the plain text of the Spectrum Act.

Moreover, the Commission utterly failed to observe the basic Administrative Procedure Act ("APA") requirements.  In particular, the Commission violated the APA by:

- failing to consider reasonable alternatives to the novel procedures adopted by the Order;

- failing to provide a sufficient and reasoned explanation for its refusal to preserve coverage area and population served; and

- violating the APA's notice requirements by adopting changes that are not a logical outgrowth of any notice of proposed rulemaking and by failing to provide public notice of the software and settings that will be used in the incentive auction.

Compounding these errors, a divided Commission *sua sponte* issued a "Declaratory Ruling" on September 30, 2014—in apparent response to Petitioners' lawsuits—attempting to justify its failure to preserve broadcasters' coverage areas.  As the two dissenting Commissioners noted, however, that Declaratory Ruling—

issued absent notice and comment—cannot remedy the legal errors in the Commission's incentive auction Order.

In addition, Sinclair has identified two separate Spectrum Act and APA violations concerning how the auction and repacking of television stations must occur. *First*, the Order establishes a 39-month post-auction transition period for broadcasters that are assigned to new channels during the repacking process. JA__(Order¶559). At the end of this period, broadcasters must terminate operations on their pre-auction channels. Yet the Commission's *own* expert determined that, even in the best-case scenario, a single complex transition site would require at least 41 months to complete the transition. And numerous commentators explained that even this estimate was unrealistic. The Commission has no meaningful response to these concerns. The hard deadline will force some broadcasters to cease broadcasting, and thus fails to preserve either "coverage area" or "population served" in direct contravention of the Spectrum Act and in violation of the APA.

*Second*, the Commission misconstrued the Spectrum Act's provision that the FCC "may not enter into an agreement for a licensee to relinquish spectrum usage rights in exchange for a share of auction proceeds … unless … at least *two competing licensees participate* in the reverse auction." 47 U.S.C. § 309(j)(8)(G)(ii) (emphasis added). This requirement was intended to ensure that the auction price reflects a competitive market valuation of the relinquished spectrum. But the FCC

4

determined that "two competing licensees" will "participate" in the reverse auction if any two broadcast licensees—from anywhere in the country—submit pre-auction applications. This interpretation unreasonably strains the definition of "competing" because licensees situated on opposite sides of the country obviously do not compete; and it unreasonably construes "participate" to be based on *pre-auction* activities, rather than actual participation in the auction itself.

## JURISDICTIONAL STATEMENT

Petitioners seek review of a final FCC order captioned, *Expanding the Economic and Innovative Opportunities of Spectrum Through Incentive Auctions*, Report and Order, GN Dkt. No. 12-268 (rel. June 2, 2014), JA__. A summary of the Order was published in the Federal Register on August 15, 2014. *See* JA__(79.Fed.Reg.48,442). NAB and Sinclair each filed timely petitions for review on August 18, 2014 and September 15, 2014, respectively, pursuant to 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, and Federal Rule of Appellate Procedure 15(a).

In addition, NAB seeks review of a *sua sponte* Declaratory Ruling of the FCC that purports to clarify the FCC's approach to preserving broadcasters' coverage area. *See Expanding the Economic and Innovative Opportunities of Spectrum Through Incentive Auctions*, Declaratory Ruling, GN Dkt. No. 12-268 (rel. Sept. 30, 2014), JA__. NAB filed its petition for review on October 29, 2014, pursuant

to 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, and Federal Rule of Appellate Procedure 15(a).  On October 31, 2014, this Court consolidated NAB's petitions for review.

This consolidated action concerns a final agency rule that disposes of all parties' claims, and is properly before this Court.

## STATEMENT OF THE ISSUES

Petitioners jointly present the following challenges to the FCC's Order and Declaratory Ruling, which were promulgated under the Spectrum Act:

1.      Whether the Commission violated the Spectrum Act by introducing a new methodology, *TVStudy*, to determine the coverage area and population served for broadcast television licensees, when the Spectrum Act expressly requires that coverage area and population served be "determined using the methodology described in OET Bulletin 69 of the Office of Engineering and Technology of the Commission" as of February 22, 2012.  47 U.S.C. § 1452(b)(2).

2.      Whether the Commission violated the Spectrum Act by developing auction procedures that fail to protect the population served for broadcast television licensees, when the Spectrum Act requires the FCC to make "all reasonable efforts to preserve … [the] population served of each broadcast television licensee."  47 U.S.C. § 1452(b)(2).

6

3.     Whether the Commission violated the Spectrum Act by developing auction procedures that fail to protect the coverage area for broadcast television licensees, when the Spectrum Act requires the FCC to make "all reasonable efforts to preserve … the coverage area … of each broadcast television licensee."  47 U.S.C. § 1452(b)(2).

4.     Whether the Commission violated the APA by:  (a) failing to consider reasonable alternatives to the auction procedures adopted in the Order; (b) providing no reasoned explanation for its refusal to preserve coverage area and population served, either in the Order or the Declaratory Ruling; (c) adopting changes that are not a logical outgrowth of the notice of proposed rulemaking, such as failing to protect viewers against terrain losses, denying protection to unpopulated areas, and using *TVStudy* in lieu of the methodology described in OET Bulletin 69; and (d) violating the APA's notice and comment requirements by releasing *TVStudy* updates through nonpublic channels.

Sinclair presents the following challenges to the FCC's Order promulgated under the Spectrum Act:

5.     Whether the FCC violated the Spectrum Act and the APA by requiring broadcasters to cease broadcasting on pre-auction channels within 39 months after issuance of channel reassignments.

7

**6**.    Whether the FCC violated the Spectrum Act and the APA by ignoring the "two competing participants" limit on its incentive auction authority and adopting arbitrary interpretations of "competing" and "participants."

## STATUTES AND REGULATIONS

The text of relevant statutes and regulations is set forth in the Addendum to this brief.

## STATEMENT OF THE CASE

### A.    The Spectrum Act

The Spectrum Act instructs the FCC to conduct a three-step incentive auction to reallocate certain voluntarily relinquished broadcast spectrum to wireless providers.  *See* 47 U.S.C. § 1452.  Congress intended to provide market-based financial incentives to repurpose existing broadcast television spectrum for the commercial wireless industry, while ensuring minimal disruption to broadcasters and their millions of viewers.

*First*, the Commission must hold a "reverse auction" that is purely voluntary for television broadcasters "to determine the amount of compensation that each broadcast television licensee would accept in return for voluntarily relinquishing some or all of its broadcast television spectrum usage rights."  47 U.S.C. § 1452(a)(1).  Television broadcasters then may sell their spectrum rights to the Commission for remuneration.  To ensure that the price for relinquished spectrum

is established by a competitive market, the Spectrum Act provides that "at least

two competing licensees [must] participate." *Id.* § 309(j)(8)(G)(ii).

*Second*, the Commission may reorganize the broadcast television spectrum

by "repacking" remaining television broadcasters into a smaller band of the spec-

trum. During repacking, the Commission may make "reassignments of television

channels" and "reallocat[e]" portions of the broadcast television spectrum to make

bands of contiguous spectrum available for future sale to wireless providers. 47

U.S.C. § 1452(b)(1)(B). This authority, however, is expressly circumscribed in the

Spectrum Act, which provides that:

> In making any reassignments or reallocations under paragraph (1)(B),
> the Commission shall make all reasonable efforts to preserve, as of
> February 22, 2012, the coverage area and population served of each
> broadcast television licensee, as determined using the methodology
> described in OET Bulletin 69 of the Office of Engineering and Tech-
> nology of the Commission.

*Id.* § 1452(b)(2).

*Third*, following the repacking, the FCC will conduct a standard "forward"

auction, in which the newly available spectrum will be auctioned off to bidders

(including mobile broadband providers). *See* 47 U.S.C. § 1452(c).

## B.  OET Bulletin 69

The Spectrum Act's prescription for the repacking process incorporates a

long-standing FCC methodology, "OET Bulletin 69 of the Office of Engineering

and Technology of the Commission." 47 U.S.C. § 1452(b)(2) ("OET Bulletin 69"

or "Bulletin"). OET Bulletin 69 was first released in 1997 and was updated in 2004. *See* OET Bulletin 69, *Longley-Rice Methodology for Evaluating TV Coverage and Interference* (Feb. 6, 2004), JA__.

OET Bulletin 69 dictates how the FCC calculates a broadcaster's coverage area and population served. The ultimate calculations depend on an array of variables, including the location and frequency of the transmitting signal, the terrain in the area, the distribution of population, and interference from other signals. The Bulletin "provides guidance on the implementation and use of Longley-Rice methodology for evaluating TV service coverage and interference …. The Longley-Rice radio propagation model is used to make predictions of radio field strength at specific geographic points based on the elevation profile of terrain between the transmitter and each specific reception point." JA__(OET.Bulletin.69.at.1).

Under the three-step procedure laid out by the Bulletin, the FCC first draws a roughly circular "contour" around a TV station's transmitter based on the FCC's generic assumptions of signal strength over distance. *See* JA__(OET.Bulletin.69.at.1-2, 11) (citing 47 C.F.R. § 73.683); *see also* 47 C.F.R. § 73.683(a). The Bulletin next specifies a procedure for calculating the areas within that contour where broadcast television service will not be received due to terrain or interference. *See* JA__(OET.Bulletin.69.at.2). The area inside the contour is divided into a grid of square cells, and "[t]he coordinates of census blocks falling

10

inside each cell are retrieved along with the population of each block. From this information, the total population and the coordinates of the cell centroid are determined for each cell." JA__(OET.Bulletin.69.at.11). Finally, the Longley-Rice model is applied to the cells to account for terrain and interference from other broadcast signals, yielding the broadcaster's coverage area and population served. *See* JA__(OET.Bulletin.69.at.11-12).

The computer program that executes these steps plays a key role in the Bulletin. The first paragraph states that "[a] computer is needed to make these predictions because of the large number of reception points that must be individually examined." JA__(OET.Bulletin.69.at.1). It then directs readers to the original computer code and descriptions of subsequent modifications to that code. *Id.* The Bulletin later provides a website where the OET Bulletin 69 computer program (in Fortran code) can be downloaded. *See* JA__(OET.Bulletin.69.at.10-11). Roughly a third of the Bulletin is devoted to "provid[ing] information on implementation of the FCC's Longley-Rice Computer program." JA__(OET.Bulletin.69.at.1); *see also* JA__(OET.Bulletin.69.at.10-13). Throughout, the Bulletin explains how the computer program resolves problems and sources data. *See*, *e.g.*, JA__(OET.Bulletin.69.at.5) ("[f]or cells with population, the point chosen by the FCC computer program is the population centroid"); JA__(OET.Bulletin.69.at.6)

11

("The FCC computer program is linked to a terrain elevation database with values every 3 arc-seconds of latitude and longitude.").

## C.     The Rulemaking Process

### 1.        The Proposed Rule

The FCC released a Notice of Proposed Rulemaking ("NPRM") for the incentive auction in late 2012. *See Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, 77 Fed. Reg. 69,934 (Nov. 21, 2012), JA__. For the most part, the NPRM did not discuss the issues presented here. There was no suggestion that the Bulletin might be updated, that the FCC might leave unpopulated coverage areas unprotected during repacking, or that the FCC would fail to protect populations against terrain loss—that is, loss of a signal where terrain disrupts a reassigned channel in ways that did not affect the broadcaster's previous channel. *See* JA__(77.Fed.Reg.at.69,945-46).

In its comments, NAB urged the Commission to (among other things) preserve areas and populations served by "fill-in translators" during repacking. *See* JA__(NAB.NPRM.Reply.Comment.47-52(Mar.12,2013));       JA__(NAB.NPRM Comment.8-9(Jan.25,2013));      *see also*      JA__(NAB.Sunshine.Comment.1-7(May.8,2014)). Broadcasters use "translator stations" to "retransmi[t] the programs and signals of a television broadcast station, without significantly altering any characteristic of the original signal other than its frequency and amplitude, for

the purpose of providing television reception to the general public." 47 C.F.R. § 74.701(a). They are "intended to provide service to areas where direct reception of full-service broadcast stations is unsatisfactory because of distance or intervening terrain obstructions." *Amendment of Parts 73 & 74 of the Commission's Rules to Establish Rules for Digital Low Power Television*, Report and Order, 19 FCC Rcd 19331, 19334 (2004) ("First Digital TV Translator Order"). "Fill-in translators" are retransmission stations expressly authorized by the Commission "to provide 'fill-in' service to terrain-obstructed areas within a full-service station's service area." *Id.*; *see also* JA__(Order¶164) (a full power station's "service area" is the same as its coverage area).

For some stations, a significant portion of the viewing audience receives its signal from a translator. *See* JA__(NAB.NPRM.Reply.Comment.49-50(Mar.12,2013)). The Commission's NPRM did not state that broadcasters would lose protection for coverage area and population served if those areas and populations were served by FCC-approved fill-in translators.

### 2. *TVStudy*

Ten days after opening comments were due for the NPRM, the FCC's Office of Engineering and Technology, "announce[d] the release of new software to perform interference analyses using the methodology described in its Bulletin No. 69"—called "*TVStudy*"—that the Office "plan[ned] to use … in connection with

13

the proposed broadcast television spectrum incentive auction." *Office of Engineer-ing and Technology Releases and Seeks Comment on Updated OET-69 Software* 1, FCC Public Notice DA 13-138, ET Docket No. 13-26 (rel. Feb. 4, 2013), JA__. The Office of Engineering and Technology sought comment on "the software gen-erally," on "the identification of any errors, unexpected behaviors, or anomalous results produced in running the software," and on "the implementation of various analytical elements in the software that are not specifically addressed in OET-69." *Id.* It did not solicit comment on whether to replace the existing OET Bulletin 69 software, the legality of these changes, or any additional suggestions of changes to the software.

The new *TVStudy* software departed in many ways from the software de-scribed by OET Bulletin 69. It used new programming languages (Java and C) and new code. It employed a single, global grid. And it altered the population and ter-rain data, changed the treatment of antenna beam tilt, changed the calculation of depression angles, used more precise geographic coordinates, and changed how in-ternally "flagged" results (known as "error codes") were resolved.

NAB promptly met with the FCC staff to express "serious reservations" with the staff's proposed use of *TVStudy* in the repacking. JA__(NAB.Notice.of.Ex.Parte.Communication.1-5,ET.Dkt.No.13-26 (Feb.8,2013)). NAB further objected that using *TVStudy* during the incentive auc-

14

tion would violate the Spectrum Act, and that, in any event, a change of this magnitude must come from the Commission—rather than the staff—after a formal comment period with sufficient opportunity to assess the software. *See* JA__(NAB.Comment.3-19,ET.Dkt.No.13-26(Mar.21,2013));

JA__(NAB.Reply.Comment.2-5,ET.Dkt.No.13-26(Apr.5,2013)).  NAB also submitted evidence showing that *TVStudy* would reduce calculated coverage area and population served for many television stations, and that the existing OET Bulletin 69 software is fully capable of generating the calculations needed for the incentive auction.    *See*    JA__(NAB.Comment.Ex.1(Tawil.Decl.),ET.Dkt.No.13-26 (Mar.21,2013));         JA__(NAB.Comment.Ex.2(Meintel.Decl.),ET.Dkt.No.13-26 (Mar.21,2013)); *see also* JA__(NAB.Comment.12-17,  20-21,ET.Dkt.No.13-26 (Mar.21,2013));   JA__(NAB.Reply.Comment.5-7,ET.Dkt.No.13-26(Apr.5,2013)); JA__(NAB.Sunshine.Comment.1-8.&.AttachmentsA-F,          ET.Dkt.No.13-26 (May.8,2014)).

Shortly after the Public Notice announcing *TVStudy*, the FCC began "releasing" new versions of *TVStudy* via a private list-serve and a website.  The newest versions of the software overwrote the previous versions, and the FCC never informed subscribers how the settings in the software should be configured.  The FCC also posted approximately 90 pieces of correspondence from the e-mail user group relating to software implementation, errors, and changes—none of which, to

NAB's knowledge, constitute part of the record in this proceeding. NAB objected to this irregular procedure. *See* JA__(NAB.Comment(Apr.4,2014)).

### 3.    Widelity Repacking Report

The FCC engaged Widelity, Inc. to assess the challenges and costs associated with the repacking process. Widelity, Inc., *Response to the Federal Communications Commission for the Broadcaster Transition Study Solicitation* at 7, GN Docket No. 12-268 (Dec. 30, 2013) ("Widelity Report"); JA__.[1] Widelity identified numerous concerns, including manufacturing and human capital resource shortages, the inability of broadcasters to prepare in advance, and substantial timing obstacles. *See* JA__(Widelity.Report.9-10); JA__(NAB.Comment.18-23 (Apr.21,2014)). Widelity's own best-case scenarios found that some broadcasters would require at least 41 months to complete their transition to a new channel following the auction. *See* JA__(Widelity.Report.44, 50-53) (discussing a single site involving five broadcasters). Many commenters noted that Widelity overlooked additional factors likely to delay repacking, including concerns about manufacturers' production constraints, the availability of skilled tower crews, and other design

---

[1]   This report was released in connection with the public notice captioned *Media Bureau Seeks Comment on Widelity Report and Catalog of Potential Expenses and Estimated Costs*, GN Docket No. 12-268 (Mar. 20, 2014), 79 Fed. Reg. 18,026 (Mar. 31, 2014).

and construction bottlenecks.  *See*, *e.g.*, JA__(GatesAir.Comment.4-8 (Apr.21,2014)).

### D.    The Final Rule

In a 3-2 decision, the FCC adopted OET's proposal to use *TVStudy* during the incentive auction.  *See* JA__(Order¶¶127-61).  The lone proposal rejected was a change in the resolution of internally "flagged" results.  *See* JA__(Order¶¶158-60).

**1.**    While acknowledging that reassigning a broadcast station to a new channel may create new terrain losses for that station, JA__(Order¶163), the Commission decided not to recognize such population and coverage losses, and instead to protect only against population (but not coverage area) losses due to new interference caused by other broadcast television stations, *see* JA__(Order¶¶176-82).  The Commission also refused to protect fill-in translators, even though they are the only way for certain broadcasters to continue serving their existing viewers. *See* JA__(Order¶¶236-44, 164 n.553).

The Commission also unexpectedly announced that it would preserve only "the coverage area of a station to the degree that the area is populated." JA__(Order¶114 n.372); *see also* JA__(Order¶¶162-66).  No explanation was given for this change.

17

The Commission discussed no possible alternatives to *TVStudy* that would have avoided changes in broadcasters' coverage areas and populations served. Nor did the Commission discuss the possibility of protecting against terrain loss, pre-serving currently unpopulated coverage areas, or ensuring that fill-in translators have a channel on which to operate. And the Commission never explained why its desired changes to data inputs—including population data, terrain data, treatment of antenna beam tilt, calculation of depression angles, and geographic coordi-nates—were necessary.

The Order also established a 39-month post-auction transition period for broadcasters assigned to new channels. JA__(Order¶559). This period commenc-es on the FCC's announcement of the final channel assignments and includes (1) three months during which broadcasters will submit permit applications, imme-diately followed by (2) 36 months of construction deadlines for transitioning broadcasters. JA__(Order¶¶525, 559-60). Significantly, the 39-month period is shorter than the transition time that the FCC's own expert (and numerous com-menters) concluded would be needed for some broadcasters. *See Reassignment Costs Report PN* (Dec. 30, 2013) ("Widelity Report"), *released for public com-ment on* Mar. 20, 2014, 79 Fed. Reg. 18,026, at 44, 50-53, JA__; *see also* JA__(GatesAir.Comment.4-6(Apr.21,2014));          JA__(Stainless.Comment.2 (Apr.21,2014)); JA__(Dielectric.Comment.3(Apr.21,2014)); JA__(American Tow-

er.Corp.Comment.1-7(Apr.21,2014)). While acknowledging "the need for a post-incentive auction transition timetable that is flexible for broadcasters," the FCC expressly rejected any exceptions to the 39-month deadline. JA__(Order¶¶559-61, 573).

Finally, the Order determined that the statutory requirement for participation by "two competing licensees" as a prerequisite for the reverse auction would be satisfied "if the pre-auction application" of more than one licensee "is found to be complete and in compliance with the application rules, and if at least two such licensees are not commonly controlled." JA__(Order¶413). The Commission concluded that all participants in the auction, regardless of location, compete with each other because they all seek to "receive incentive payments from the same limited source—the aggregate proceeds of the forward auction." JA__(Order¶414). Emphasizing its perceived need to increase the amount of spectrum reallocated, the Commission argued that any other interpretation would "limit the Commission's ability to allow market forces to determine the highest and best use of spectrum." JA__(Order¶415).

### 2.    Commissioners Pai and O'Rielly dissented.

Commissioner Pai described the Order's violation of the Spectrum Act at length, saying that ultimately the Order is "trying to fit a square peg into a round hole." JA__(Order.p.478). He particularly complained that *TVStudy* "departs in

several respects from the methodology described in OET-69." *Id.* He also object-ed to the process by which *TVStudy* was adopted, explaining that "[t]hese changes should have been the subject of a notice-and-comment rulemaking." JA__(Order.p.480). Nor was it clear to him "what today's vote means," since the Commission does not know what version of *TVStudy* will be used: "OET has been regularly releasing updated versions of the software and apparently will continue to do so even after today." JA__(Order.p.481).

Commissioner O'Rielly likewise warned that the Order "skid[s] across the line," because "Congress was abundantly clear that it wanted to hold harmless non-participating broadcasters in their ability to serve their over-the-air viewers." JA__(Order.p.484).

**3.**     The Order was released on June 2, 2014, and published in the *Federal Register* on August 15. *See* JA__(79.Fed.Reg.48,442). Also on June 2, 2014, OET released a new version of *TVStudy* through a private list-serve. NAB filed its peti-tion for review on August 18, 2014, and Sinclair filed a separate petition challeng-ing the Order on September 15, 2014. This Court consolidated the petitions on September 29, 2014.

On September 30, 2014, more than a month after NAB filed its petition for review, and almost four months after adopting the Order, the Commission *sua sponte* adopted a Declaratory Ruling purporting to "clarify how [it] intend[s] to

preserve the 'coverage area' as well as the 'population served' of eligible broad-

casters in the repacking process." JA__(*Expanding.the.Economic and.*

*Innovation.Opportunities.of.Spectrum.Through.Incentive.Auctions*,Declaratory.

Ruling.1(Sept.30,2014)).  In the Declaratory Ruling, which was released without

notice and comment, the Commission confirmed that it will attempt only to "'rep-

licat[e] the area within a station's existing contour'"—the first step of the OET

Bulletin 69 procedure for calculating coverage area and population served—but

"will not protect" unpopulated cells within that contour "from new interference in

the repacking process." JA__(Declaratory.Ruling.3) (alteration in original; internal

quotation marks omitted).  This decision not to protect broadcasters' existing cov-

erage areas was justified, in the Commission's view, because "'population served'

by definition excludes unpopulated areas and areas where a station's signal cannot

be received due to existing interference from other stations." *Id.*  The FCC did not

explain why the statute used both "coverage area" and "population served" as op-

posed to simply "population served" alone.

    Commissioners Pai and O'Rielly again dissented.  Commissioner Pai noted

that the Declaratory Ruling's purported clarification was "unnecessary" because

the FCC's incentive auction Order "was quite clear" that the Commission will "not

protect unpopulated areas from interference," and "the deadline for its reconsidera-

tion has expired."  JA__(Declaratory.Ruling.6 &n.32).  Commissioner O'Rielly

observed that, in issuing the Declaratory Ruling, the FCC was "attempting to strengthen its litigation position" in this matter by "sidestep[ping] normal Commission procedures for questionable gain." JA__(Declaratory.Ruling.8).

NAB filed a petition for review of the Declaratory Ruling on October 29, 2014, along with a motion to consolidate that challenge with this appeal. The Court granted that motion on October 31, 2014.

## STANDARD OF REVIEW

Administrative agencies "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984). "Deference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000); *see also Chevron*, 467 U.S. at 843-44. An agency's interpretation of a statute can survive only if it is not contrary to the statutory text and the agency reasonably fills any interpretative gaps. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

Moreover, "[i]t is axiomatic that administrative agencies may issue regulations only pursuant to authority delegated to them by Congress." *Am. Library*

*Ass'n v. FCC*, 406 F.3d 689, 691 (D.C. Cir. 2005).  If the Commission acts *ultra vires*, its "regulations cannot survive judicial review."  *Id.* at 699.

Under the APA, this Court will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] in excess of statutory jurisdiction."  5 U.S.C. § 706(2)(A) & (C).  An agency acts arbitrarily and capriciously if it "'entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or [if it] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014) (quoting *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  During a rulemaking, an agency "must respond in a reasoned manner to [comments] that raise significant problems."  *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006) (internal quotation marks omitted).  Agencies must also "consider significant alternatives to the course it ultimately chooses."  *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000).

## SUMMARY OF ARGUMENT

The Commission's Order and Declaratory Ruling violate the Spectrum Act and the APA in numerous respects.  Those portions of the Order (and specifically sections noted below), as well as the Declaratory Ruling, should be vacated.

23

**I.**     The Order violates the Spectrum Act in at least four ways.  Sections III.B.2 and III.B.3.d.iii of the Order should be vacated.

**A.**     The Commission's decision to replace the methodology described in OET Bulletin 69 with a new methodology devised by FCC staff during the rule-making is patently unlawful.  The Spectrum Act unambiguously requires the Commission to "us[e] the methodology described in OET Bulletin 69" in determining the coverage area and population served to be protected for each broadcast television licensee in the repacking.  47 U.S.C. § 1452(b)(2).  The methodology described in OET Bulletin 69 is a fixed suite of software and procedures that existed on February 22, 2012 and had been used by the FCC for years to calculate interference between broadcast signals.  *That* is the methodology specified in the Spectrum Act—not *TVStudy*, which did not exist in 2012.  Yet the Commission's new *TVStudy* methodology produces vastly different calculations for coverage area and population served than would have been calculated under OET Bulletin 69.  The Commission cannot properly use a methodology that differs from the one required by Congress.

**B.**     The Commission also failed to preserve population served for more than 1,000 television stations that likely will be relocated in the repacking process.  Congress directed the FCC to "make all reasonable efforts to preserve … the population served" by each broadcast television licensee as of February 22, 2012 (47

24

U.S.C. § 1452(b)(2)), yet the Commission decided *not* to protect against terrain losses that will occur to the signals of reassigned licensees. Such terrain losses mean that, *ex ante*, the FCC will not protect broadcasters' coverage areas and populations served. As the Commission itself acknowledged, such losses are a foreseeable consequence of the repacking, and thus its decision to protect *only* against new interference from other broadcast television stations plainly violates the Spectrum Act's preservation mandate.

**C.** The Commission's decision not to protect broadcasters' coverage areas that are unpopulated cannot be squared with the statute's explicit command that *both* population served *and* coverage area be preserved for each licensee. By protecting only geographic areas having a "population served," the Commission reads "coverage area" out of the statute. While the Order attempts this statutory revision *sub silentio*, the Declaratory Ruling removes any doubt that the Commission "will not protect" unpopulated areas. JA__(Declaratory.Ruling¶6). The ability to serve such areas is a valuable right for broadcasters and an invaluable service to the public, as mobile service is increasingly essential to consumers and because populations shift and grow over time. That is why Congress directed the Commission to protect such areas in the repacking, and why the Commission's refusal to do so violates the Spectrum Act.

**D.**    The Commission also violated the Spectrum Act's preservation mandate by failing to preserve the coverage areas and populations that broadcast television licensees serve with fill-in translators.  Viewers who receive television signals from fill-in translators are no less served by broadcast television licensees than viewers who receive the main signals directly.  The FCC cannot preserve each licensee's coverage area and population served without accounting for these expressly authorized translators.

**II.**    In addition to violating the plain text of the Spectrum Act, the Commission's irregular actions in issuing the Order violate several requirements of the APA.

**A.**    An agency always "must consider reasonably obvious alternative rules and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review."  *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984) (alteration and internal quotation marks omitted).  That precept applies with special force here, where the Spectrum Act directs that the Commission "shall make all reasonable efforts" to preserve coverage area and population served for broadcast television licensees in the repacking.  47 U.S.C. § 1452(b)(2).  But the Commission failed to consider and provide adequate reasons for rejecting numerous reasonable alternatives for conducting the repacking that would be far less prejudicial to broadcasters' rights—and far more faithful to the Spectrum Act's

26

preservation mandate—than the methodology adopted in the Order.  Such unconsidered alternatives and unexplained decisionmaking are the hallmarks of arbitrary and capricious agency action.

**B.**     The Commission also failed to provide a reasoned explanation for its determination not to preserve coverage areas that are currently unpopulated.  Instead, it attempted to supply that explanation after this lawsuit was filed by releasing a *sua sponte* Declaratory Ruling.  But once the period for reconsideration has lapsed and litigation is filed, such gratuitous pronouncements are nothing more than "a *post hoc* rationalizatio[n] advanced by an agency seeking to defend past agency action against attack."  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (alteration in original; internal quotation marks omitted).  And the Declaratory Ruling merely reaffirms what was already clear:  The Commission "will not protect" unpopulated areas within a broadcast licensee's contour in the repacking process.  JA__(Declaratory.Ruling.3).  Missing is a reasoned explanation for *why* the Commission refuses to protect these areas, and *how* its decision comports with the Spectrum Act's mandate to protect both population served *and* coverage area.  Similarly, the Commission provided no reasoned explanation for its failure to protect viewers against terrain losses, despite acknowledging in the NPRM that such losses must be rectified to comply with the statutory preservation mandate.

27

**C.**    Moreover, the Commission adopted the Order in a bait-and-switch that flatly contravenes the APA's notice requirements.  There is no hint in the NPRM that the Commission was considering making comprehensive changes to the OET Bulletin 69 methodology mandated by the Spectrum Act.  Indeed, not until *after* opening comments were due did the FCC's *staff*—via public notice—announce that the Commission would use a new methodology in the repacking.  Those dramatic changes are not a logical outgrowth of the NPRM.  Even worse, the Commission *to this day* continues to "release" updated versions of *TVStudy* through private channels, thus precluding meaningful testing and depriving the public of its right to notice and comment.  The Spectrum Act states that the Commission has until 2022 to conduct the incentive auction, so there is no looming deadline to blame for these transgressions.  Such chicanery is not tolerable under the APA, and the relevant portions of the Order should be vacated.

**III.**    In addition to the above arguments presented on behalf of both Petitioners, Sinclair contends that the Commission's Order contravenes the Spectrum Act and the APA in two additional respects.  Sections V.C.2 and IV.B.1.d of the Order should also be vacated.

**A.**    The Order requires repacked broadcasters to cease operations on their pre-auction channels within 39 months following the release of channel reassignments.  Yet the evidence before the Commission is clear that some broadcasters

28

cannot construct replacement facilities by that deadline, even under ideal conditions.  The record contains unrebutted evidence that many broadcasters will be unable to meet the 39-month deadline due to critical shortages in material and human resources, as well as delays caused by weather, local permitting issues, and judicial review.  Indeed, the FCC's own expert reported that, in the "best case scenario[]," assuming "no glitches" and not accounting for resource shortages, a single highly complex site would require at least 41 months to transition.  JA__(Widelity.Report.44, 53).  The Order thus violates the statutory requirement that the Commission "make all reasonable efforts to preserve" the broadcast services provided by broadcasters that cannot meet the deadline.  47 U.S.C. § 1452(b)(2).  The Commission's failure to address and refute this record evidence renders its decision arbitrary, capricious, and contrary to law.

**B.**    In setting its reverse auction rules, the FCC also ignores a fundamental statutory requirement for the incentive auction.  Its decision to permit broadcasters in single-bidder markets to participate in the reverse auction violates the Spectrum Act's requirement that "two competing licensees participate" in each reverse auction buyout.  47 U.S.C. § 309(j)(8)(G)(ii).  The Order adopts an impossibly strained interpretation in which this statutory requirement is satisfied if as few as *two stations nationwide qualify to participate* in the reverse auction, regardless of whether either actually bids.  This not only defies the plain language and com-

mon-sense reading of the statute, but also is contrary to the FCC's own auction procedures, which recognize that, to participate in the auction, a licensee must actually bid, and that reverse auction bidders compete only with other bidders within their geographic areas, not on a nationwide basis.  The FCC's interpretation sidesteps a key statutory purpose of the reverse auction:  to determine the market value of the spectrum rights relinquished by means of competitive bidding.  The FCC's rule is thus *ultra vires*, arbitrary, capricious, and contrary to law.

## STANDING

### A.    NAB

NAB has standing to sue on behalf of its members because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  The second and third requirements are clearly satisfied here:  NAB is a nonprofit trade association that advocates for free local television stations and broadcast networks before Congress, agencies, and the courts; and none of its claims requires the participation of an individual member.

NAB likewise satisfies the first requirement because its members would have standing to sue in their own right.  Because NAB's members are "object[s] of

30

the action" under review, there is "little question" that they satisfy this require-
ment. *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (citation omitted).
In any event, the attached declarations establish standing. *See* Ex. A (Decl. of Per-
ry Sook (Aug. 25, 2014)); Ex. B (Decl. of Raycom Media, Inc. (Aug. 22, 2014)).
The Order's failure to preserve coverage area and population served will likely
lead to decreased viewership and revenue for NAB members. *See* Ex.
A(Sook.Decl.) ¶¶ 4-6; Ex. B(Raycom.Decl.) ¶¶ 4-6. A drop in viewership will also
decrease retransmission fees from cable, satellite, and other telecommunications
providers, *see* Ex. A(Sook.Decl.) ¶ 10; Ex. B(Raycom.Decl.) ¶ 6, and make sta-
tions less competitive in their local markets, *see* Ex. A(Sook.Decl.) ¶¶ 8-10; Ex.
B(Raycom.Decl.) ¶¶ 8-10. The declarations thus establish that the Order's failure
to preserve coverage area and population served create a substantial risk of harm
for NAB's members, which would be redressed by vacating the Order.

### B.     Sinclair

Sinclair also has standing to challenge the FCC's Order. *First*, Sinclair has
standing to challenge the FCC's 39-month "go-dark" deadline because this man-
date will force multiple Sinclair stations to cease all operations 39 months after
new channel assignments are issued. *See* Ex. C (Decl. of Mark A. Aitken (Nov. 7,
2014)) ¶¶ 5-15, 17-19. Sinclair owns at least 27 stations in the band most likely to
face repacking. *Id.* ¶ 19. Many of Sinclair's stations will be repacked, forcing

31

Sinclair to redesign their facilities or construct new facilities to begin broadcasting on newly assigned frequencies. *Id.* ¶¶ 10, 17-19. There is a substantial likelihood that some of these stations will be forced to cease broadcasting until construction is complete, causing irreparable injury. *Id.* ¶¶ 7-15, 17-20. This injury is directly traceable to the FCC's 39-month go-dark mandate and would be redressed by a favorable decision of this Court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

*Second*, the Order creates a legally invalid procurement process. A bidder or potential bidder in a government auction "has a right to a legally valid procurement process; a party allegedly deprived of this right asserts a cognizable injury." *High Plains Wireless, L.P. v. FCC*, 276 F.3d 599, 605 (D.C. Cir. 2002) (internal quotation omitted). The fact that the bidder has not participated in the auction or that the auction has not yet occurred does not defeat standing. *See Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 7 (D.C. Cir. 2009) (injury in fact despite withdrawing from auction); *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 829-30 (D.C. Cir. 1997) (unlawful process prevented participation). Although the reverse auction has not yet commenced, the auction process established by the Order is invalid, creating an injury in fact to Sinclair. Also, the invalid process will cause more of Sinclair's more than 100 stations to be involuntarily repacked, incurring greater expense, disrupting Sinclair's operations and imposing millions of dollars in costs and lost reve-

nue.[2]  Ex. C ¶¶ 5, 17-20.  These injuries are "obviously … traceable to the alleged illegality in [the auction] and redressable by any remedy that eliminates the alleged illegality."  *DIRECTV*, 110 F.3d at 829 (second alteration in original; internal quotation marks omitted).  Here, Sinclair's injuries are redressable because the auction process can be amended to meet statutory requirements and Sinclair is "ready, and willing, and able to participate" in a valid incentive auction.  *See High Plains*, 276 F.3d at 605 (citation omitted); Ex. C ¶ 16.

## ARGUMENT

### I.    The Commission's Rule Violates The Spectrum Act

In the Order, the Commission managed to violate the key 45 words—"the Commission shall make all reasonable efforts to preserve, as of February 22, 2012, the coverage area and population served of each broadcast television licensee, as determined using the methodology described in OET Bulletin 69 of the Office of Engineering and Technology of the Commission"—in three distinct ways.  It revised the "methodology described in OET Bulletin 69."  47 U.S.C. § 1452(b)(2).  It refused to preserve "coverage area" alongside "population served."  *Id.*  And it disregarded the translators that establish the "coverage area and population served" for a large number of broadcast television licensees.  *Id.*

---

2    The FCC seeks to repurpose as much of the broadcast spectrum as possible, within a generally consistent nationwide band plan.  *See* JA__(Order¶82-83).  By engaging in transactions precluded by the statute, the FCC is able to recover more spectrum, which leads to more repacking.

Not coincidentally, all of these decisions weaken the ability of broadcasters who choose not to "voluntarily relinquis[h]" their spectrum usage rights to continue to serve their current viewers.  Despite Congress's clear direction to provide additional spectrum for mobile broadband only to the extent it can be achieved while protecting broadcasters and their viewers, the FCC made clear that its overriding goal is the former.  *See*, *e.g.*, JA__(Order¶122).  But even if "repurposing spectrum" (*id.*) were *a* purpose of the Spectrum Act, "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's … objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam).  Here, Congress quite clearly spelled out safeguards for broadcasters on how statutory purposes will be achieved, which the Commission is not free to disregard in its freewheeling search for purpose.  In attempting to turn the "voluntary" process into one that steamrolls broadcasters into relinquishing their spectrum usage rights, the FCC ignores the Spectrum Act's rival purpose:  to protect broadcasters who choose not to tender their spectrum usage rights.

## A.     The Spectrum Act Directs The FCC To Use The Methodology Described In OET Bulletin 69, Not *TVStudy*

### 1.     The Spectrum Act Unambiguously Forecloses *TVStudy*

Section 6403(b)(2) of the Spectrum Act requires the FCC, when reassigning or reallocating spectrum, to make all reasonable efforts to "preserve, as of February 22, 2012, the coverage area and population served of each broadcast television

34

licensee, *as determined using the methodology described in OET Bulletin 69*." 47 U.S.C. § 1452(b)(2) (emphasis added). The Spectrum Act thus addresses the nitty-gritty that other statutes sometimes leave for administrative agencies. It specifies not only what the agency should do ("preserve … the coverage area and population served") but also the means to measure the agency's success—both when ("as of February 22, 2012") and how ("as determined using the methodology described in OET Bulletin 69"). *Id.* Because "there is no gap for the agency to fill," administrative deference is not warranted. *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994).

The statute is exceptionally straightforward in how the FCC should preserve broadcasters' coverage areas and populations served: The Commission must follow the procedures of OET Bulletin 69 as it existed when the Spectrum Act became law. (The FCC does not dispute this command, yet repeatedly departs from it.) First, the Commission must input the necessary transmission-specific information (frequency, location of antenna, antenna height, etc.) to determine each station's coverage area and population served as of February 22, 2012. Second, for each proposed channel reassignment, the Commission must repeat these steps to determine the station's *new* coverage area and population served on the new channel. Third, the Commission "shall make all reasonable efforts" to make every broadcast licensee's coverage area and population served, after repacking, match

35

that licensee's coverage area and population served, as they existed on February 22, 2012.  47 U.S.C. § 1452(b)(2).

Only on the third step does the FCC have some limited flexibility.  "All reasonable efforts" at preservation does not require complete preservation in every case.  But the FCC's "efforts" still must aim for the right target:  preserving the coverage area and population served, as they existed on February 22, 2012, as determined by the procedures in the then-existing Bulletin.

Congress's command to preserve coverage area and population served for each broadcast television licensee using the OET Bulletin 69 methodology serves at least two related purposes critical for a successful incentive auction.  *First*, the preservation mandate ensures that the Commission does not coerce broadcasters or harm viewers by shrinking broadcasters' coverage areas and populations served in the name of repurposing spectrum.  The preservation mandate thus is designed to provide the certainty needed for broadcasters' *voluntary* participation in an incentive auction based on market principles.  *See* FCC, *2010 National Broadband Plan: Broadband Action Agenda* 1 n.3 (success in repurposing spectrum for mobile broadband "depends on … voluntary participation of broadcasters in an auction"), http://www.broadband.gov/plan/broadband-action-agenda.html.  *Second*, the preservation mandate allows potential sellers to make informed decisions about what exactly they would be selling.  If the scope of licensees' spectrum usage

36

rights were determined using a shifting and untested methodology to calculate mutable values for coverage area and population served, licensees are handicapped in their ability to judge whether it makes economic sense to participate in the reverse auction.

Here, in contrast, the FCC introduced a new computer program that changed many of the procedures that the Bulletin discussed.  The FCC admits that *TVStudy* "is not designed to"—and "necessarily does not"—"produce the identical results produced by earlier software."  JA__(Order¶161).  That admission is dispositive.  Because the FCC did not "make all reasonable efforts to preserve, as of the date of the enactment of this Act, the coverage area and population served of each broadcast television licensee, as determined using the methodology described in OET Bulletin 69," the relevant portions of the Order must be set aside.

### 2.    The FCC's Hunt For Ambiguity Comes Up Short

Despite clear statutory language, the FCC strains to find ambiguity.

The FCC's central argument is that the word "methodology" is ambiguous.  *See* JA__(Order¶¶133-36).  It agrees that the "common meaning" of "methodology" is "the processes, techniques, or approaches employed in the solution of a problem or in doing something:   a particular procedure or set of procedures."  JA__(Order¶134 n.436) (indirectly quoting *Webster's Third New International Dictionary of the English Language Unabridged* 1423 (1st ed. 1976)).  But the

37

agency contends that "methodology" includes only "the particular procedures for evaluating television coverage and interference that are provided for in [OET Bulletin 69], *not the computer software or input values used to apply that methodology in any given case*."    JA__(Order¶134) (emphasis added).    So, according to the FCC, changes to the computer program and data sources fall outside of the Bulletin's "methodology."

An examination of what the (excruciatingly detailed) Bulletin actually "describe[s]" makes clear that the procedures it sets forth explicitly include the key "processes, techniques, and approaches" that the FCC now wants to change:

- *Station-specific grid:*  In its "outline of evaluation procedure," OET Bulletin 69 describes building a "coordinate box" around the broadcast station that "is divided into square cells of a chosen size which should be 2 km on a side or smaller, adjusting the coordinate box to be slightly larger if necessary to accommodate an integer number of cells." JA__(OET.Bulletin.69.at.11) (underlining and capitalization omitted). Nonetheless, the FCC now seeks to replace those "station-specific grid[s]" with "a single, common grid of cells common to all television stations." JA__(Order¶¶131-32).  This change alone will reduce the population served for 42.6 percent of stations.   JA__(NAB.Comment.12, Ex.1(Tawil.Decl.)¶18,ET.Dkt.No.13-26(Mar.21,2013)).

38

- *Terrain data:* Noting that "terrain elevation data … must be provided," the Bulletin explained its approach to terrain data as follows: "The FCC computer program is linked to a terrain elevation database with values every 3 arc-seconds of latitude and longitude. The program retrieves elevations from this database at regular intervals with a spacing increment which is chosen at the time the program is compiled …." JA__(OET.Bulletin.69.at.6). For the incentive auction, however, the FCC plans to eliminate both the database and the measurement. JA__(Order¶150 & n.500). Instead, the FCC will substitute U.S. Geological Survey data with a resolution of one arc-second. JA__(Order¶150). This change will reduce the population served for 85 percent of stations. JA__(NAB.Comment.13 n.50, Ex.1(Tawil.Decl.)¶14,ET.Dkt.No.13-26 (Mar.21,2013)).

- *Computer program:* OET Bulletin 69 expressly refers to the "[c]omputer code for the Longley-Rice point-to-point radio propagation model," which was "referred to as Version 1.2.2 of the Longley-Rice model" and "used by the FCC for its evaluations." JA__(OET.Bulletin.69.at.1). Further, the Bulletin explained that "[t]he FCC computer program is available as Fortran code," and "[t]he Fortran code currently used by the Media Bureau to evaluate new proposals is available for downloading from the

FCC    Internet    site    at    http://www.fcc.gov/oet/dtv."

JA__(OET.Bulletin.69.at.10-11).  "It is complex, and many of its options

are available only by recompilation for each case of interest."

JA__(OET.Bulletin.69.at.10).  Yet the FCC now seeks to use the com-

pletely new *TVStudy*, with fresh code, languages, and compilation tech-

niques.  *See* JA__(Order¶¶131 n.427, 132 & n.430, 135 n.441); *see also*

JA__(OET.Notice.3(Feb.4,2013)) (*TVStudy* uses Java and C).  The latest

version of *TVStudy* will reduce coverage area for between 52.3 and 88

percent of stations, and will reduce population served for between 45 and

52.1 percent of stations.   JA__(NAB.Sunshine.Comment.3-7, Attach-

ments.C,D, F ,ET.Dkt.No.13-26(May.8,2014)).

- *Population data:*  While the Bulletin itself said only that the coordinates

  and population of census blocks "are retrieved," *see*

  JA__(OET.Bulletin.69.at.11), the FCC *itself* has characterized changes in

  the census data as a change in "methodology."  The FCC's rulemaking

  on digital television "revise[d] the OET 69 interference analysis method-

  ology" by "adopt[ing] the use of 2000 census data."  Third Periodic Re-

  view of the Commission's Rules and Policies Affecting the Conversion

  to Digital Television (Third Periodic Review), 73 Fed. Reg. 5634, 5668-

69 (Jan. 30, 2008), JA__.  For the auction, however, the FCC intends to substitute 2010 census data.  *See* JA__(Order¶148).

The other processes, techniques, and approaches that the FCC seeks to change—including how to calculate depression angles, the antenna beam tilt values, the precision of geographic coordinates, and other information in the database—are all part of Version 1.2.2, the computer program discussed by the Bulletin.  *See* JA__(Order¶¶153, 155-57).  And the Bulletin incorporates that program by reference.  As the FCC acknowledges twice, "OET-69 specifically states that a computer program is necessary to implement the methodology." JA__(Order¶127); *accord* JA__(Order¶135); *see also* JA__(OET.Bulletin.69.at.1) (same).  Moreover, the Bulletin comprehensively describes the processes, techniques, and approaches taken by its computer program, and explains where to find the code and software.  By "updating" the program to eliminate these procedures, the FCC abandons the "methodology described in OET Bulletin 69."

Indeed, the FCC's view of "methodology" strips the term of all meaning.  In a footnote reproduced below,[3] the FCC explains what methodology it believes the

---

[3]  Under our interpretation, the OET-69 methodology comprises (1) a specification for determining a contour that defines the boundaries of a station's coverage area, and (2) an algorithm for evaluating the availability of service within that contour, including the effects of interference from neighboring stations.  The evaluation of service involves the use of the Longley-Rice propagation model, certain planning factors, electromagnetic properties of the environment, and parameters for describ-

Spectrum Act protects.  But almost any approach that complies with the laws of physics will satisfy the FCC's interpretation.  As Commissioner Pai recognized, "replac[ing] a terrain elevation database of the United States with a database where terrain elevations were randomly generated" would satisfy the FCC's construction of the Spectrum Act (although it would violate the APA).  JA__(Order.p.480).

This Court has rejected similar endeavors to detach the "methodology" from the underlying data inputs.  The issue arose in two different ways in *City of Idaho Falls, Idaho v. FERC*, 629 F.3d 222 (D.C. Cir. 2011).  In that case, FERC had long relied on a Forest Service fee schedule to determine how much rent to charge hydropower plants on federal land.  *See id.* at 224.  The Forest Service, in turn, used its own survey data to construct the fee schedule.  *See id.* at 223-24.  But in 2008, the Forest Service (and another agency) changed course and began to rely on an outside source.  As this Court explained, in language directly relevant here:  "The *methodology* the BLM and the Forest Service used to set rates in this revised

---

ing a television station's transmission system.  Planning factors describe television reception; for example, planning factors include antenna gain information for specific frequency bands, thermal noise levels, and system noise figure by band, etc.  *See* OET-69 at 3, Table 3.  Electromagnetic properties include the dielectric properties of earth and surface refractivity.  The parameters that describe a television station's transmission system include effective radiated power, antenna pattern, antenna polarization and height of the radiation center above ground.  *See* OET-69 At 6, Table 4.

JA__(Order¶134 n.435).

42

schedule differed in several significant ways from their previous *methodology, with each input in the agencies' calculation formula changing in some respect*."  *Id.* at 225 (emphases added).  This Court thus recognized that changing an "input in the … calculation formula" constitutes a change in "methodology."

Moreover, the Forest Service's change in methodology in *City of Idaho Falls* gave rise to the agency action at issue in the case—FERC's decision to continue to follow the Forest Service's fee schedule:

> The key issue before us is this: in promulgating the 2009 Update [that relied on the revised Forest Service fee schedule], did FERC change its *methodology* for setting rental fees charged to hydropower licensees from the *methodology* it had adopted in Order No. 469 and Regulation 11.2?  If the answer is yes, then FERC violated APA section 553.  Having established through public rulemaking in Regulation 11.2 a legally-binding *methodology* for setting future rates for licensees, FERC may modify that *methodology* only after notice and comment.

629 F.3d at 227 (emphases added).  Overturning FERC's interpretation of its own regulation, the Court found that FERC had changed its methodology.  *See id.* at 227-31.  In other words, even though FERC was still relying on the Forest Service fee schedule, changes to that fee schedule meant that FERC had changed its own "methodology."

The lone case that the FCC cites in support of its distinction, by contrast, is inapposite.  *See* JA__(Order¶134 n.438) (citing *Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001)).  In *Qwest*, the Tenth Circuit reviewed two FCC orders.  In

43

the first order—described in one place as a "methodology"—the FCC finalized a two-part method to determine state funding, relying in part on a cost model. *See Qwest*, 258 F.3d at 1197-98. In the other order, the FCC "selected input values for its cost model, thereby completing the model." *Id.* at 1198. The Tenth Circuit struck down the first order as inadequately explained but upheld the second. *See id.* at 1205-07. Nothing in the opinion bears on whether underlying data and implementing computer programs are part of the "methodology."

In addition, as Commissioner Pai recognized, the FCC's interpretation of "methodology" "stands in stark contrast to prior Commission pronouncements." JA__(Order.p.478). In 2008, the FCC decreed: "We will revise the OET 69 interference analysis *methodology* to make the results more accurate and ensure consistent *methodology*. Specifically, we adopt the use of 2000 census data for use in all applications and we adopt a limited set of cell sizes, which include 2 km, 1 km, and 0.5 km." 73 Fed. Reg. at 5668 (emphases added); *see also id.* at 5669-70 (similar). The FCC's response is to claim—implausibly—that it was using "methodology" here "colloquially." JA__(Order¶136). Yet elsewhere, too, the FCC has recognized that what it now seeks to change is part of the Bulletin's "methodology." *See, e.g.*, *In re Qualcomm Inc. Petition for Declaratory Ruling*, 21 FCC Rcd. 11683, 11690 (2006) ("As for the vertical antenna patterns that Qualcomm will actually use, compared with *the default vertical antenna patterns inherent in the*

*OET-69 methodology*, Qualcomm asserts that it re-computed its sample analyses using the actual MediaFLO antenna patterns and the results are identical under either condition." (emphasis added)).

In fact, in offering alternative statutory language in the very Order at issue here, the FCC could not avoid the term "methodology":  "Had Congress intended to prevent any updates to the software and input values used to implement the OET-69 methodology, it could have expressly directed the FCC *to use the methodology described in OET-69, including* the February 6, 2004 version of one of the Commission's computer programs implementing that methodology and the inputs used as of that date."  JA__(Order¶137) (emphasis added).

It bears mention that the FCC is correct that some "inputs" are separate from methodology—namely, the broadcaster-specific information that OET Bulletin 69 contemplates each licensee providing.  These include the station location and the frequency of transmission, user inputs that define the specific licensee that is the subject of the calculation.  But they do not include procedures and data sources common to all calculations of coverage area and population served, like using 3 arc-second terrain data or 2000 census data.  Nor can the FCC now create new broadcaster-specific inputs (like antenna angle) that were not "described" in OET Bulletin 69 when Congress enacted the Spectrum Act.

45

Beyond manipulating the definition of "methodology," the FCC tries other maneuvers to support its action.  It first argues that by "more accurately re-flect[ing] the latest population changes" and incorporating other changes, its inter-pretation "furthers the statutory requirement to 'make all reasonable efforts to pre-serve … the coverage area and population served of each broadcast television li-censee.'"  JA__(Order¶137).  But this argument ignores the measure of preserva-tion decreed by statute:  preservation must be "determined using the methodology described in OET Bulletin 69."  When Congress enacted the Spectrum Act, the Commission's rules required the use of 2000 census data as part of the methodolo-gy described in OET Bulletin 69.  47 C.F.R. § 73.616(e)(1).  The statute does not give the FCC a freestanding mandate to ignore its own rules or preserve its chosen measures of coverage and population.

The FCC next cites its "well-established duty under the [APA] to 'analyze … new data' when faced with existing data that 'are either outdated or inaccu-rate.'"  JA__(Order¶138) (omission in original) (quoting *Dow Agrosciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013)).  And the agency criticizes NAB's interpretation for bringing a "direct conflict" with that duty.  Once again, however, the FCC ignores Congress's directive to "determin[e]" the coverage and population "using the methodology described in OET Bulletin 69" *as of a specific date*.  47 U.S.C. § 1452(b)(2).  *TVStudy* is plainly different from the

tools that existed on February 22, 2012 to calculate coverage area and population served, yet those are the only tools that Congress could have anticipated.  Congress fixed a specific benchmark, and the statute requires the FCC to follow the Bulletin's procedures even if the agency believes them to be "outdated or inaccurate."  An agency does not violate the APA when it follows a congressional command to use specific procedures and data.

Finally, the FCC suggests that the software described in the Bulletin is incapable of handling the Spectrum Act's demands.  *See*, *e.g.*, JA__(Order¶¶132, 143 n.478).  Not so.  The FCC recently used the OET Bulletin 69 software successfully in the nationwide transition from analog to digital broadcasts.  *See* JA__(NAB.Comment.4, Ex.2(Meintel.Decl.)¶¶4,12, ET.Dkt.No.13-26 (Mar.21,2013)).  And the FCC today continues to use that software for those purposes for which it was already in use on the date of the Spectrum Act—namely, "processing applications for new or modified stations." JA__(OET.Bulletin.69.at.1).  In adopting OET Bulletin 69 for the incentive auction, Congress picked a methodology that existed on a date certain for a specific purpose—and the Commission continues to use the methodology for *that* purpose while changing it *here*, which surely meets any definition of arbitrary.

Yet even if the FCC's objections were accurate, the solution is not to cast off OET Bulletin 69 so early in the ten-year period for conducting the incentive auc-

tion.  The statute requires that the FCC make "all reasonable efforts" to preserve the coverage area and population served, as determined by the methodology in the Bulletin.  If the FCC concludes (after good faith efforts not attempted here) that what Congress prescribed is not possible, only then can it fix the bottleneck—presumably with a new programming language and new code.  But unlike the current software, the FCC's substitute program must be, as much as possible, "designed to produce the identical results produced by earlier software." JA__(Order¶161).

### 3.    The FCC Misconstrued The Statute's Preservation Mandate

An independent error also requires vacatur here:  The FCC repeatedly states that "the Spectrum Act not only permits us to use [the new computer program], but—because the statute requires the Commission to make all reasonable efforts to preserve broadcast stations' coverage areas and populations served as of February 2012—*requires* us to update the software and data inputs necessary to implement the methodology set forth in OET-69 to predict coverage as of that date as accurately as possible."  JA__(Order¶130) (emphasis added); *see also* JA__(Order¶¶137-39) (same).  In other words, the Commission asserts that its adoption of *TVStudy* was mandatory under the statute.

Putting aside any argument that the Spectrum Act *permits* the new procedures, it certainly does not *mandate* them.  This Court has made clear that

48

"[d]eference to an agency's statutory interpretation is only appropriate when the agency has exercised its *own* judgment, not when it believes that its interpretation is compelled by Congress." *Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002) (internal quotation marks omitted). When an agency wrongly believes that the statute compelled its action, the action "must … be set aside and the case remanded." *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004).

There is nothing in the Spectrum Act that would require the Commission to alter its methodology for calculating coverage area and population served; to the contrary, the references to a specific date (February 22, 2012) and a specific, existing methodology (OET Bulletin 69) foreclose any assertion that Congress envisioned a new methodology. Because the FCC mistakenly believed that the statute's preservation mandate obliged the agency to update the computer program and data, the Order should be set aside.

*        *        *

Much of the FCC's Order is an appeal to common sense: Why use archaic software and outdated or imprecise data, when we can write a better program and draw on better sources? *See*, *e.g.*, JA__(Order¶¶134, 137-39, 149-50). As a matter of policy, there may be some sense to the FCC's argument. But there is sense, too, in Congress's judgment that the certainty that comes with a familiar standard is critical to achieving a successful, voluntary incentive auction. It does not well

serve the auction or the millions of over-the-air television viewers to have a shift-ing standard, let alone one that is different in the auction context than any other. That is the policy behind the preservation mandate, and "[t]he role of this Court is to apply the statute as it is written—even if [it] think[s] some other approach might accord with good policy." *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 878 (2014) (internal quotation marks omitted). The Spectrum Act clearly forecloses the FCC's "updates" to OET Bulletin 69.

### B.   The FCC Has Not Made All Reasonable Efforts To Preserve All Populations Served

In addition to unlawfully adopting a new methodology for preserving cover-age area and population served, the Commission has quietly declined to protect the populations served by broadcasters who are reassigned in the repacking.

The Spectrum Act's mandate to preserve "population served" protects against two types of long-recognized signal loss that broadcasters reassigned dur-ing repacking will experience. The first is loss caused by new interference from other broadcast facilities. JA__(Order¶179). The second is loss caused when a broadcaster's new frequency travels over, and interacts with, terrain features in dif-ferent ways than its old frequency—so-called "terrain loss." JA__(Order¶163). The Commission has declared that it will only protect against interference loss, not terrain loss. *See* JA__(Order¶¶176-82).

No explanation is offered for the Commission's startling decision to ignore terrain loss, an admitted and inevitable harm that will befall reassigned broadcasters.  *See* JA__(Order¶163) (acknowledging loss of coverage "due to the varying propagation characteristics of different channels, which can change the degree to which areas within a station's contour are affected by terrain loss").  This is plainly unlawful:  The Commission has not made "all reasonable efforts" to preserve population served if it has made *no* effort to protect against terrain loss.  47 U.S.C. § 1452(b)(2).  Nor is it adequate that a reassigned broadcaster "may seek alternative transmission facilities" as a self-remedy for terrain loss.  JA__(Order¶175).  As the Commission admits, such relief would be possible only "provided a channel is available and the alternative facilities meet all existing technical and interference requirements and serve the public interest," as determined in the Commission's discretion.  *Id.*  Even apart from the unlikely possibility of relocation, however, the FCC cannot invoke this speculative possibility to salvage the Order:  Complying with the Spectrum Act's preservation mandate is not a discretionary choice by the Commission.

### C.  The FCC Has Not Made All Reasonable Efforts To Preserve All Coverage Areas, Including Unpopulated Ones

Other violations of the Spectrum Act are simpler to understand, but no less jarring.  The Act demands preservation of "the coverage area *and* population served."  47 U.S.C. § 1452(b)(2) (emphasis added).  The conjunction "and" makes

51

clear that the FCC must preserve both population served and coverage area. *See*, *e.g.*, *Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) (discussing the "conjunctive 'and'").

At least two reasons animate the need to preserve coverage area in addition to population served. *First*, populations shift and grow over time, as the Commission explains in attempting to justify the use of different census data. JA__(Order¶137). Preserving a licensee's coverage area ensures that it will continue to be able to serve viewers as new or seasonal areas within its contour become populated. *Second*, mobile communications are an increasingly important means of consuming information. Broadcasters have developed an industry standard for mobile digital television, the success of which depends on the availability of broadcast television in coverage areas outside of people's homes. *See* Advanced Television Sys. Comm., Inc., *ATSC-Mobile DTV Standard, Part 1 – ATSC Mobile Digital Television System* (2011), http://www.atsc.org/cms/standards/a153/a_153-Part-1-2011.pdf. As Congress plainly recognized in the statute, the world has changed such that serving households alone is insufficient.

Nonetheless, the Commission plans to preserve only "the coverage area of a station to the degree that the area is populated." JA__(Order¶114 n.372); *see also* JA__(Order¶¶162-66). Following that decision, the FCC has now shifted its focus solely to preserving populated areas (and only for stations that do not change chan-

nels, *see supra* Part I.B).  *See*, *e.g.*, JA__(Order¶451 n.1303) (acknowledging only the requirement of preserving broadcasters' population served); Incentive Auction Task Force Seeks Comment on Staff Analysis Regarding Pairwise Approach to Preserving Population Served, 79 Fed. Reg. 37,705 (July 2, 2014) (same), JA__. This departure from the statute leaves no protection for broadcasts in areas where people may stay temporarily or seasonally, move in the future, or wish to use mobile television or any other services provided over a broadcaster's signal.

The Commission acknowledges that the Spectrum Act requires protecting both population served and coverage area.  JA__(Order¶119).  It asserts, however, that it can satisfy this requirement by matching a station's existing contour—without accounting for interference or terrain losses on the newly assigned channel.  JA__(Order¶166).  Under this construction, a station's coverage area could be wiped out entirely due to new interference or terrain loss, yet the Commission supposedly would have "preserved" the coverage area by *beginning* with the station's contour.  But calculating a licensee's contour is only a preliminary step for calculating coverage area and population served under the OET Bulletin 69 methodology, and the Commission cannot preserve coverage area if the second step eradicates it with new interference and terrain loss.  Indeed, the Commission's approach is flatly contrary to the methodology in OET Bulletin 69, which is concerned with

53

determining the areas within a contour where service can be received *after* terrain losses and interference are considered.  *See* JA__(OET.Bulletin.69.at.5-12).

The Declaratory Ruling merely affirms the Commission's decision not to protect all coverage areas.  Despite proclaiming to "independently protect" coverage area and population served, the Commission's only effort to protect coverage area is to *start* with a station's existing contour.  JA__(Declaratory.Ruling¶¶5, 8-9).  The Commission itself admits that this does not mean that all areas within the contour will be protected in the repacking.  Quite the contrary, many areas within a station's contour "will not be protected"—including "unpopulated areas." JA__(Declaratory.Ruling¶¶6-7).  Thus, simply starting with a licensee's existing contour cannot satisfy the Spectrum Act's mandate to *preserve* coverage area in the repacking.  Because the Declaratory Ruling fails to preserve broadcast licensees' coverage areas *and* population served, it, too, violates the Spectrum Act.

### D.   The FCC Failed To Protect Facilities That Licensees Use To Serve Viewers

The Spectrum Act demands that the Commission "make all reasonable efforts to preserve" the "coverage area and population served of each broadcast television licensee."  47 U.S.C. § 1452(b)(2).  Because this preservation right attaches to the "licensee," rather than the station or type of facility used, it should protect areas and populations that the licensee serves with fill-in translators—the retransmission stations that fill holes in coverage within the licensed area.

54

These facilities are inextricably linked with the primary broadcast facility. As part of the nation's transition to digital television, the FCC expressly permitted certain broadcast television licensees to use additional facilities to ensure they could continue to reach viewers they served before the transition. According to the FCC, it was "the Commission's goal that, following the digital transition, all Americans continue to receive the television broadcast service that they are accustomed to receiving to the greatest extent feasible." *In re Amendment of Parts 73 & 74 of the Commission's Rules to Establish Rules for Replacement Digital Low Power Television Translator Stations*, Report and Order, 24 FCC Rcd. 5931, 5933 (2009). To that end, the Commission established "a new, 'replacement' digital television translator service for the purpose of maintaining broadcast service that the public has come to depend upon and enjoy." *Id.* Because translators merely "maintai[n]" service to a licensee's existing coverage area and population, many translators have the same FCC-issued station identifier, and the same call letters, as the licensee's primary facility.

In the Order, however, the Commission refused to protect these additional facilities. *See* JA__(Order¶¶236-44, 164 n.553). Despite "recogniz[ing] that [its] decision will result in some viewers losing the services of these stations," the FCC "conclude[d] that these concerns are outweighed by the detrimental impact that protecting … TV translator stations would have on the repacking process and on

55

the success of the incentive auction." JA__(Order¶237). The Order's denial of coverage rested entirely on the definition of "broadcast television licensee," which the Spectrum Act defines to mean "the licensee of—(A) a full-power television station; or (B) a low-power television station that has been accorded primary status as a Class A television licensee." 47 U.S.C. § 1401(6); *see* JA__(Order¶238). After quoting that definition, the Commission declared: "There is no basis in the text of section 6403(b)(2) or the pertinent statutory definitions to conclude that low power stations that have not been accorded Class A status are entitled to the protections afforded by section 6403(b)(2)." JA__(Order¶238).

The FCC missed the point. The relevant question is not whether standalone TV translator stations qualify for the same protections as full power or Class A broadcasters. It is whether broadcast television licensees should *lose* protection because they use authorized facilities "to provide 'fill-in' service to terrain-obstructed areas within a full-service station's service area." First Digital TV Translator Order, 19 FCC Rcd at 19334. Such licensees are undoubtedly protected by the statute's preservation mandate. Part of the "coverage area and population served" by these broadcasters comes from retransmissions with fill-in translators. It would be a simple matter for the FCC to protect all facilities that licensees use to reach their coverage areas and populations served. The FCC could meet its statutory obligation simply by finding replacement channels for these facilities that li-

censees could use to serve viewers and areas within their contours.  By failing to do so, the FCC violated the Spectrum Act once more.

## II.    The Commission's Order Violates The APA

In addition to violating the Spectrum Act, the Order violates the APA in several ways.  The Commission ignored obvious alternative solutions.  It gave no explanation—reasoned or otherwise—for refusing to protect unpopulated coverage areas.  And it made changes that were never mentioned in the NPRM and frustrated attempts to comment.  Accordingly, even aside from the Spectrum Act, the Order cannot stand.

### A.    The FCC Failed To Consider Reasonable Alternatives

Under the APA, "an agency must consider reasonably obvious alternative rules and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review."  *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984) (internal quotation marks and alteration omitted); *see also Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46-51 (1983); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013).  "[T]he failure of an agency to consider obvious alternatives has led uniformly to reversal."  *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (internal quotation marks omitted).

The APA's mandate to consider all reasonable alternatives carries special force here because it is underscored by the Spectrum Act. Congress expressly directed that the Commission "shall make all reasonable efforts" to preserve licensees' coverage areas and populations served, 47 U.S.C. § 1452(b)(2), and gave the Commission a generous ten-year period to do so, *id.* § 1452(f)(3).

Repeatedly, however, the Commission ignored or brushed aside obvious alternatives that comply with the Spectrum Act en route to its favored, unlawful approaches. Take, for example, the Commission's adoption of *TVStudy*. Despite its claims to the contrary, JA__(Order¶¶130, 131 n.427), the Commission's existing OET Bulletin 69 software is perfectly capable of performing in the repacking stage of the incentive auction; indeed, the Commission recently used it successfully in the transition from analog to digital broadcasts. Even assuming that the OET Bulletin 69 software operates more slowly than more modern programs, the Commission has failed to consider alternatives that use the same data sources and yield the same results as the OET Bulletin 69 software, but with the added speed and efficiency of more modern computer programs, and it has nowhere explained why the calculated coverage area and population served should depend on the rapidity with which those values are calculated.

The FCC also failed to consider reasonable alternatives for preserving population served. For example, while the FCC adopted a benchmark for population

lost due to new interference (*see* JA__(Order¶179)), it did not consider establishing a similar benchmark for protecting viewers against terrain loss on a licensee's new channel.  The FCC also never considered calculating population served for each licensee on each channel as of February 22, 2012, and then simply excluding those channel reassignments that would result in more than a specified percentage change in a given licensee's population served.  The Commission simply ignored terrain losses and made no effort to compensate for them.

So, too, with coverage area.  The FCC never considered the possibility of maintaining protection for unpopulated coverage areas—that is, not until this petition was filed.  The Declaratory Ruling's *post hoc* justifications bear guilty testimony to the Commission's failure to consider obvious measures to preserve licensees' coverage areas.  Of course, an agency's decision commands no deference "when it appears that the interpretation is nothing more than a convenient litigating position, or a *post hoc* rationalizatio[n] advanced by an agency seeking to defend past agency action against attack."  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (internal quotation marks and citations omitted; alteration in original).

Similarly, the Commission never considered preserving licensees' coverage areas and populations served through the obvious alternative of finding a new channel for the translator facilities that licensees use to serve viewers.  Here, as

59

elsewhere, the Commission simply raced headlong toward its foreordained outcomes instead of using the ample time Congress provided to craft an auction plan that complies with the Spectrum Act and protects the rights of stakeholders.  Its actions are arbitrary and capricious.

**B.    The FCC Failed To Provide A Reasoned Explanation For Its Refusal To Preserve Population Served And Coverage Area**

"When an administrative agency sets policy, it must provide a reasoned explanation for its action."  *Judulang v. Holder*, 132 S. Ct. 476, 479 (2011).  And a court "must reverse an agency policy when [the court] cannot discern a reason for it."  *Id.* at 490.

**1.**     The Commission failed to provide a reasoned explanation for its refusal to protect populations that will lose broadcast television service due to terrain loss.  The Commission admits that "radio signals propagate differently on different frequencies" and thus "the signal of a station reassigned to a different channel will generally not be receivable in precisely the same locations within a station's contour as it was in its original channel."  JA__(Order¶170).  Nonetheless, the Commission refused to compensate for this loss by allowing broadcast television licensees to increase power to ensure they reach the same coverage area within their contours on their new channels, JA__(Order¶172)—as they did in the conversion to digital television, *see supra* at 47.  The Commission argued that expanding a licensee's contours would "expand the geographic area that a station actually

60

serves" (JA__(Order¶172))—a factually inaccurate statement that conflates "contour" with "coverage area."  The coverage area that a station serves, as measured by OET Bulletin 69, is the area within a contour where terrain and interference allow reception.  *See* JA__(Order¶164) (interpreting the statutory term "coverage area" consistent with the term "service area" as defined in OET Bulletin 69 and 47 C.F.R. § 73.622(e)).  Thus, expanding a licensee's contour would not necessarily increase coverage area; rather, it might allow a broadcaster to preserve its coverage area by overcoming terrain losses on its new channel.

The Commission claims that the Spectrum Act requires the Commission only to preserve the status quo, and that allowing broadcasters to expand their contours could result in a "windfall" in the form of new viewers.  JA__(Order¶172).  But the Spectrum Act uses "preserve" to mean the prevention of *losses*, not the prevention of increases.  It is thus not inconsistent with the Spectrum Act that licensees could potentially experience *de minimis* gains in viewership if that result is necessary to prevent losses of service to existing viewers.  At the very least, it is certainly not a reason to ensure losses.[4]

---

[4]  In a footnote, the Declaratory Ruling cites the Commission's regulation for determining digital television service areas.  *See* JA__(Declaratory.Ruling¶5 n.20) (citing 47 C.F.R. § 73.622(e)(1)-(2)).  The citation is instructive for what it omits—namely, the subsection of the regulation that explains that interference must be taken into account when calculating service area.  *See* 47 C.F.R. § 73.622(e)(3).  The Commission ignores this part of the regulation to avoid admitting that interference must be taken into account when preserving a licensee's cov-

**2.**    The Commission also gave no reason for refusing to protect unpopulated coverage areas.  It never explained how that decision conforms with its statutory obligation to make all reasonable efforts to preserve "the coverage area *and* population served."  47 U.S.C. § 1452(b)(2) (emphasis added).  Nor did it say why divesting unpopulated areas of protection makes sense as a policy matter.  Indeed, the Order does all that it can to conceal the FCC's decision not to protect all coverage areas—the decision to deny coverage is barely acknowledged, buried in a footnote.  *See* JA__(Order¶114 n.372).  Such an unexplained, covert ruling in an "obscurely placed nugget" cannot qualify as reasoned decisionmaking.  *McElroy Electronics Corp. v. FCC*, 990 F.2d 1351, 1361 (D.C. Cir. 1993).

## C.    The Rule Violated The APA's Notice Requirements

The APA requires an agency to publish a "notice of proposed rulemaking … in the Federal Register," and then "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. § 553(b)-(c).   "Given the strictures of notice-and-comment rulemaking, an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former."  *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).  In addition, an agency must "reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary so that a

---

erage area.  *See* JA__(Declaratory.Ruling¶5) (stating that coverage area will be preserved "without regard to interference").

genuine interchange occurs rather than allowing an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236-37 (D.C. Cir. 2008) (brackets and internal quotation marks omitted).

The NPRM failed to meet those requirements. Three of the four Spectrum Act violations described above were improperly noticed, preventing NAB (and other members of the public) from filing meaningful comments.

*First*, the NPRM provided no notice that the Commission was considering not protecting viewers against terrain loss. To the contrary, it identified the problem of terrain loss and invited "comment on a repacking methodology that takes in account all of these impacts in order to carry out Congress's mandate in section 6403(b)(2)." JA__(77 Fed. Reg. at 69,945). The NPRM thus admits that failure to protect viewers from terrain loss violates the Spectrum Act's preservation mandate, without providing any indication that the Commission might decline to account for terrain loss.

*Second*, the NPRM never even suggested that the Commission was considering denying protection to unpopulated areas. Since "[s]omething is not a logical outgrowth of nothing," that silence in the proposed rulemaking prohibits the final rule. *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994).

*Third*, the NPRM gave no indication that changes to OET Bulletin 69 methodology—like *TVStudy*—were on the table.  And a "public notice" by OET cannot substitute for a proper proposal by the Commission.  This Court rejected a similar attempt to evade the APA in *Sprint Corp. v. FCC*, 315 F.3d 369 (D.C. Cir. 2003).  Like OET, *see* 47 C.F.R. § 0.31, the Common Carrier Bureau has no authority to propose rulemakings, *see Sprint*, 315 F.3d at 375-76.  Such proposals must come from the Commission.  *See id.* at 374, 376.  Thus, this Court held that a "public notice" by the Common Carrier Bureau could not provide the foundation for a new FCC rule.  *See id.* at 375-76.  The same is true here.

Nor could NAB meaningfully comment on *TVStudy*.  The program was—and remains—a moving and concealed target.  The staff repeatedly modified *TVStudy* and posted revised versions on a "list-serve," with little information about what had changed.  *See* JA__(NAB.Reply.Comment.Attachment(Franca.Decl.)¶13, Ex.A,ET.Dkt.No.13-26(Apr.5,2013)); JA__(NAB.Sunshine.Comment.Attachment.C(Tawil.Decl.)¶7,ET.Dkt.No.13-26(May8,2014));        *see        also*        JA__(Order¶¶143,        145); JA__(NAB.Reply.Comment.14-16,ET.Dkt.No.13-26(Apr.5,2013)); JA__(NAB.Sunshine.Comment.7,ET.Dkt.No.13-26(May.8,2014)).    To this day, *TVStudy* continues to be revised.  *See* JA__(Order¶145).  Moreover, *TVStudy* has a number of internal settings for the user to select, called "soft switches."  But when

64

distributing the program, the staff released little information about what settings they planned to use during the incentive auction. *See* JA__(NAB.Sunshine.Comment.Attachment.C(Tawil.Decl.)¶9,ET.Dkt.No.13-26 (May8,2014)). So even if NAB obtained the most recent version of *TVStudy*, it still could not ascertain precisely how the staff planned to calculate coverage area and population served. And when NAB attempted to comment on the particulars of *TVStudy*, the FCC discounted or rejected NAB's analysis for using the wrong settings. *See*, *e.g.*, JA__(Order¶¶140-141, 161). By making commenters "play hunt the peanut" with *TVStudy*, the Commission thwarted the APA's mandatory notice and comment.

### III.  The Commission's Order Also Violates The Spectrum Act And The APA On Two Additional Grounds

In addition to the numerous flaws discussed above, Sinclair has identified two additional respects in which the Order contravenes the Spectrum Act and the APA:  its requirement that broadcasters cease operations on their pre-auction channels within 39 months of reassignment, and its determination that the auction could proceed in all markets based simply on the submission of a pre-auction application to participate by any two broadcasters nationwide.

**A.  The Commission's Rule Requiring Broadcasters To Cease Operations On Pre-Auction Channels Within 39 Months Following Reassignment Is Arbitrary And Capricious And Violates The FCC's Statutory Obligations**

The FCC has general authority to modify licenses subject to the licensee's formal protest rights.  *See* 47 U.S.C. § 316(a).  Congress recognized that a case-by-case approach would be unworkable in the face of hundreds of simultaneous license modifications resulting from the auction.  Thus, for the reverse auction only, Congress suspended broadcasters' statutory right to protest license modifications, while simultaneously imposing specific safeguards to limit the FCC's discretion to modify broadcast licenses.  *Id.* § 1452(h).  Most importantly, Congress ensured that any modified licenses resulting from the repacking would "make all reasonable efforts to preserve … the coverage area and population served of each broadcast television licensee." *Id.* § 1452(b)(2).  Recognizing the magnitude of this endeavor, Congress afforded the FCC ample time to repack the broadcast band consistent with this limitation—allowing the FCC ten years, until 2022, to complete the auction.  Congress placed no time limit on broadcasters' transition to repacked channels.  *See id.* §1452(f)(3).

The FCC, however, has arbitrarily and capriciously provided broadcasters with only three months to obtain construction permits from the FCC and a maximum of 36 months thereafter to construct new facilities after any channel reassignment—after which, without exception, all displaced broadcasters must cease

66

broadcasting on their pre-auction channels. It did so despite record evidence that plainly and conclusively shows that many stations will be unable to complete construction during this timeframe. By selecting these arbitrary and capricious time horizons, the Commission guarantees that some displaced broadcasters will lose all of their coverage for a period of time, and perhaps permanently, in violation of Section 6403(b)(2) of the Spectrum Act.

The FCC's 39-month "go-dark" deadline is not supported by the relevant data, compelled by the statute, or rooted in necessity. Because the FCC failed to articulate a rational explanation for its decision, failed to consider an important aspect of the problem, and failed to honor its statutory obligations, its rule is arbitrary and capricious, an abuse of discretion, contrary to law, and exceeds its statutory authority. *See*, *e.g.*, *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014); *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011); *Am. Library Ass'n v. FCC*, 406 F.3d 689, 699 (D.C. Cir. 2005).

### 1.    The 39-Month "Go-Dark" Requirement Conflicts With Unrebutted Record Evidence

The record evidence, including the report of the FCC's own expert, Widelity, directly contradicts the FCC's determination that 39 months "will provide sufficient time to complete a phased transition of all stations assigned to new channels." JA__(Order¶568).

The FCC engaged Widelity to examine the challenges and costs associated with the repacking process.  JA__(Widelity.Report.7).  Widelity identified a number of concerns based on interviews with "key industry members," *see* JA__(Widelity.Report.9-10), including a shortage of critical resources, the inability of broadcasters to prepare in advance, and substantial timing obstacles, *see* JA__(NAB.Comment.18-23(Apr.21,2014)).  Although Widelity estimated the time needed for certain phases, its estimates did not consider the cumulative effect of delays resulting from resource shortages, weather, permitting, and other issues. *See id.*  Even so, Widelity concluded that, in the best-case scenarios some broadcasters would require at least 41 months to complete their transition.  *See* JA__(Widelity.Report.44, 50-53).

But key industry players cautioned that the Widelity Report failed to adequately consider the combined effects of unprecedented demand coupled with unprecedented resource shortages and logistical challenges.  The world's leading transmitter manufacturer explained that 39 months is "woefully insufficient" because manufacturers "lack both the existing capacity and the ability to ramp up production" to meet the schedules suggested by Widelity and cautioned that "[t]here simply is no way to rebuild the facilities of several hundred stations nationwide" in 39 months and possibly even within a year of that target.

JA__(GatesAir.Comment.4-6(Apr.21,2014)).[5]   The leading supplier of broadcast antennas similarly noted that the Report "grossly underestimates the magnitude of the potential bottlenecks."   JA__(Dielectric.Comment.3(Apr.21,2014)).   Critical suppliers warned that industry capacity, already reduced after the completion of the 2009 transition to digital broadcasting, had diminished further after the FCC imposed a "freeze" on television station modifications in 2013, and might decline further before the auction.  *See*, *e.g.*, *id.*; JA__(GatesAir.Comment.6(Apr.21,2014)).

Similarly, many broadcasters expressed concerns that Widelity's proposed solutions were insufficient to meet the FCC's 39-month deadline.  *See*, *e.g.*, JA__(Public.Broadcasting.Service;Corp.for.Public.Broadcasting;&Assoc.of.Public .Television.Stations.("PTV").Reply.to.Comments.9-10(May.6,2014)) ("no amount of 'cooperation as well as patience, creative problem solving, and guidance from the FCC and industry groups' can guarantee that the repacking will be completed") (quoting   JA__(Widelity.Report.7));   JA__(Sinclair.Comment.2-6(Apr.21,2014)) (summarizing issues);  JA__(NAB.Comment.18-25(Apr.21,2014)  (summarizing issues)).  Sinclair warned that Widelity did not "account either for further declines in capacity resulting from the application freeze or for the impact of a sudden and dramatic increase in demand for products and services that simply are not being

---

[5]   *Accord* JA__(Stainless.Comment.2-3(Apr.21,2014)) (noting timing and safety concerns raised by current shortage of experienced tower crews; observing replacing hundreds of towers might take several years); JA__(Dielectric.Comment.2-5(Apr.21,2014)) (similar).

produced and provided in the ordinary course today." JA__(Sinclair.Comment.3(Apr.21,2014)).

But the FCC brushed aside the warnings of the very suppliers and broadcasters that will have to complete the transition, saying it "expect[s] that the equipment manufacturing and tower installation industries will respond to the greatly increased demand." JA__(Order¶571). It also concluded that the deadline was not "infeasible for a large proportion of stations" (JA__(Order¶569)), thus conceding that it *is* infeasible for many stations. Although the FCC acknowledged that "some stations will face significant challenges" (JA__(Order¶569)), it did not explain how these obstacles could be overcome, other than saying that it would stagger construction schedules in an attempt to reduce simultaneous demand. *See* JA__(Order¶¶566, 571). In other words, in the face of clear evidence that many stations will require more than 36 months to construct, the FCC's solution is to give some broadcasters *fewer* than 36 months to build.

The Commission also disingenuously claims that "[m]any commenters suggest that a construction period of up to 36 months will be sufficient to complete the transition." *See* JA__(Order¶568). But the FCC cites earlier comments made in response to its initial proposed 18-month transition period. All of these comments

70

predate the Widelity Report,[6] which detailed the significant resource shortages, bottlenecks, and other potential delays in the repacking process. Many of the same commenters later responded to the Widelity Report and expressed serious doubt that the transition could be completed within 36 months.[7] Broadcasters also emphasized the need for flexibility to ensure that broadcast services were not interrupted due to difficulties in the transition process. *See*, *e.g.*, JA__(NAB.Notice.of.Ex.Parte.Communication.14(Apr.23,2014)) ("Under no scenario should the FCC force a broadcaster off-the-air that is diligently working to complete its post-repack facility."). None of the comments responding to the Widelity Report suggested that stations should be forced off the air.[8]

By ignoring the import of its own expert's findings and dismissing out of hand industry warnings that a hard 39-month "go-dark" deadline was infeasible, the FCC acted arbitrarily and capriciously. *See*, *e.g.*, *Sorenson Commc'ns*, 755 F.3d at 707; *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Ad-*

---

[6] *See* JA__(Order¶568 n.1604) (citing JA__(Named.State.Broadcaster Assns.Comment.15(Jan.25,2013)); JA__(Belo.Corp.Comment.6(Jan.25,2013)); JA__(LIN.Television.Corp.Comment.7(Jan.25,2013)); JA__(NAB.Comment.50(Jan.25,2013); JA__(PTV.Comment.24-27(Jan.25,2013)); JA__(PTV.Reply.to.Comments.16(Mar.12,2013))).

[7] *See*, *e.g.*, JA__(PTV.Reply.to.Comments.9-10(May.6,2014)).

[8] *See*, *e.g.*, JA__(Named.State.Broadcaster.Assns.Comment.15(Jan.25,2013)) (FCC "should allow at least thirty (30) months for a 'repacked' station to complete the required modifications, subject to exceptions where, despite the vigorous efforts of a station, the station's licensee has not been able to secure all necessary governmental and non-governmental permits and consents.").

71

*min.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) (failure to respond to relevant and significant public comments generally demonstrates that agency's decision was not based on consideration of relevant factors).

> ### 2.     The FCC Ignored Its Statutory Obligation To Protect Displaced Broadcasters And Justified Its Decision By Relying On Factors That Congress Did Not Intend It To Consider

Congress understood that repacking a thousand-plus broadcasters while preserving their coverage area and population served would be challenging.  *See* 47 U.S.C. § 1452(b)(2).  Indeed, the complexity of this unique auction process is precisely what prompted Congress to give the FCC until 2022 to complete the auction process, without any deadline by which spectrum must be transitioned.  *See id.* § 1452(f)(3).[9]

And Congress was clear in its command to the FCC to use "all reasonable efforts" to preserve licensees' coverage areas and populations served.  In light of the clear evidence that a 39 month timeframe is wildly unrealistic, the FCC's decision to enforce a hard 39-month go-dark deadline—causing affected stations to lose *all* of their coverage area and population served—contravenes the statute. And "[t]he role of this Court is to apply the statute as it is written—even if [it]

---

[9]   In contrast, Congress set three-year deadlines for two other, less complex auctions that did not require the FCC to use "all reasonable efforts" in repacking.  *See* 47 U.S.C. § 1451(b)(1).

think[s] some other approach might accord with good policy." *Sandifer*, 134 S. Ct. at 878.

Moreover, the Order anticipates that some of the modified licenses may not be useable before the go-dark period for reasons beyond the control of the licensee. *See* JA__(Order¶¶546 n.1551, ¶550, ¶554 n.1571). Offering no assurances that its new channel assignments can even be built at all, the FCC nonetheless warned broadcasters that, under the Communications Act, stations that remain dark a year after the 39 month go-dark deadline are subject to cancellation of their licenses. JA__(Order¶585). In other words, broadcasters that receive unworkable assignments, or face construction delays beyond their control, may simply lose their licenses altogether.

Congress has not authorized the FCC to employ such draconian tactics in the repacking process; rather, it has proscribed such actions. Because the Commission's Order violates a critical limitation on the power delegated to it under the Spectrum Act, the Order is outside the FCC's statutory authority, and cannot survive judicial review. *See Am. Library Ass'n*, 406 F.3d at 699.

The FCC claims a hard deadline is needed to provide forward action winners with certainty, which it says is essential to a successful auction. See JA__(Order¶¶559-60, 572-73). But the choice is not so stark. The FCC could do more up-front work to determine which assignments might be most problematic to

implement post-auction and simply eliminate those from consideration.  Instead, the FCC will make channel assignments based on theoretical feasibility that does not consider easily discoverable conditions (like insufficient tower strength) that could delay or prohibit use of those assignments.  Alternatively, the FCC could have set a "certain" deadline far enough out to accommodate foreseeable delays.  Surely some homework up front, or some flexibility on the back end, constitutes "reasonable efforts" given the mandate of the Act and the ten-year timeframe.

Instead, the FCC elevated its own policy objectives over its statutory obligations to use "all reasonable efforts" to protect broadcasters and viewers.  *See* JA__(Order¶¶569, 571-73).  Indeed, the Order imposed a transition deadline that it knew some broadcasters could not meet to "provide certainty to wireless providers" and to complete the transition "as expeditiously as possible." JA__(Order¶559).  The Commission's desire to conduct the auction many years before the statutory deadline cannot supersede Congress's direction to use all reasonable efforts to protect viewers from loss of broadcast services resulting from repacking.[10]

---

[10]  The FCC also argues that a construction period that "closely coincides" with the three-year statutory reimbursement period for broadcasters' repacking expenses "will best ensure that stations are successfully reimbursed." JA__(Order¶568); *see also* 47 U.S.C. § 1452(b)(4)(D).  In fact, the deadline is unnecessary for this purpose, given the FCC's decision that broadcasters may be reimbursed based on estimated expenses.  *See* JA__(Order¶617).

The FCC's go-dark rule is a "policy preferenc[e]" that "cannot trump the words of the statute." *Dep't of the Treasury*, 739 F.3d at 21 (internal quotation marks omitted); *see also Sandifer*, 134 S. Ct. at 878; *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011). Because the go-dark rule ignores the FCC's statutory obligation to make all reasonable efforts to preserve broadcast services, it must be set aside as arbitrary and capricious and not in accordance with law. *See Sorenson Commc'ns*, 755 F.3d at 707; *see also* 5 U.S.C. § 706(2)(A).

**B.     The Commission's Determination That The Existence Of Any Two Qualified Bidders Satisfies The Spectrum Act Is Inconsistent With The Spectrum Act And Violates The APA**

**1.     The FCC's Interpretation Of The "Two Competing Licensees" Requirement Is Contrary To The Plain Language Of The Spectrum Act**

The plain language of the Spectrum Act prohibits the FCC from paying a licensee to relinquish its spectrum usage rights unless it first conducts a reverse auction to determine the price and "at least two competing licensees participate" in the auction. 47 U.S.C. § 309(j)(8)(G)(ii). This is an express limitation on the FCC's incentive auction authority that requires the price of any licensee buyout to be determined by bidding competition. But the FCC did not consider the need for competitive price discovery when deciding how to apply the requirement that two competing bidders participate. Instead, the FCC defined "participate" and "competing" in ways that make these statutory limitations meaningless.

75

The Commission defines a "participant" in the reverse auction as a licensee that submits a compliant pre-auction application to participate, regardless of whether the licensee accepts any bid. JA__(Order¶413). But elsewhere in the Order, the FCC admits that a station "participates" only if it accepts the FCC's first bid, describing an applicant declining to accept an opening price as "declining to *participate* in the reverse auction." JA__(Order¶330) (emphasis added). Completing an application cannot equate to *participation* in the reverse auction because *bidding* is what creates competition.[11] The FCC's implausible construction of "participate" renders the statutory limitation altogether meaningless. *See*, *e.g.*, *NRDC v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) ("'a court will not uphold [an agency's] interpretation that diverges from any realistic meaning of the statute'") (citation omitted; alteration in original).

The FCC also construes "competing" in a way that makes the term meaningless. The Commission maintains that "any broadcast television licensees that participate in the reverse auction and that are not commonly controlled will 'compete' with one another," regardless of their geographic location. JA__(Order¶414). Under the FCC's definition, stations in Anchorage "compete" with stations in Miami. But common sense dictates that if the FCC needs a license relinquishment in Mi-

---

[11] In other auctions, the FCC has required that bidders remain "active" or risk being prohibited from continued auction participation. *See Auction of 700 MHz Band Licenses Scheduled for January 16, 2008*, ¶ 36, FCC Public Notice, DA 07-3415, AU Docket No. 07-157 (rel. Aug. 17, 2007).

ami, it must obtain it in or near Miami. No broadcaster in Alaska or Maine can meet that need, regardless of the price, and therefore cannot possibly underbid a Miami station. Stations in distant cities are selling unique, non-fungible spectrum rights.[12] The FCC must have bidders in the same relevant market if the auction is to determine the "value of the relinquished rights." 47 U.S.C. § 309(j)(8)(G)(i).

In fact, the FCC's own reverse auction design does not contemplate competition between stations nationwide. Everywhere *except* the section discussing the "two competing participants" requirement, the Order acknowledges that for purposes of recovering broadcast spectrum, the entire country is not a single market. For example, the Order allows for recovery of different amounts of spectrum in different "markets" because this will "ensure broadcasters have the opportunity to participate in the reverse auction in markets where interest is high." JA__(Order¶82). Again, in discussing "dynamic reserve pric[ing]" the FCC acknowledges that during the reverse auction, bidding competition may exist in some *areas* but not others, noting that "bidders would be asked if they are willing to accept lower prices in *areas without bidding competition*." JA__(Order¶335) (emphasis added). If some areas can have bidding competition while others do not, plainly, the entire country is not a single market. And again, in setting the opening

---

12 The FCC recently acknowledged in another context that it is the substitutability of a product that creates price competition for the benefit of buyers. *See In re Amendment of the Commission's Rules Related to Retransmission Consent*, Report and Order and Further Proposed Rulemaking, ¶ 13, 29 FCC Rcd 3351 (2014).

prices for the reverse auction, the FCC acknowledges that competition and values are based on local supply and demand for spectrum:

> [E]ach station will see a price that takes into account objective factors, such as location and potential for interference with other stations, that affect the availability of channels in the repacking process and, therefore, the value of a station's bid to voluntarily relinquish spectrum usage rights.

JA__(Order¶450).

The FCC nevertheless claims that stations in distant markets "compete" in the sense that they "compete to receive incentive payments from the same limited source—the aggregate proceeds of the forward auction." JA__(Order¶414). Not so. The forward auction follows the reverse auction. The amount of the forward-auction proceeds will not be known until after the reverse auction has closed, so those proceeds cannot possibly inform any station's bidding strategy. *See* JA__(Order¶118). The forward-auction proceeds will impact the FCC's *budget* for the reverse auction, and may determine whether the FCC can pay the prices determined earlier by competitive bidding. JA__(Order¶469). But a budget is not a substitute for the competitive price determination required by the Spectrum Act.

The FCC's position would allow it to claim that it had conducted a reverse "auction" if only two stations anywhere in the country establish eligibility to participate, even if only one accepts a bid. Of course, it is possible to structure an auction, such as a simple reserve price auction, that can close with only one bidder.

78

The FCC's general authority to assign spectrum licenses via auction gives the FCC broad discretion to design auctions and does not require two competing participants. *See* 47 U.S.C. § 309(j). But Congress placed an express limitation on reverse auctions, requiring that at least two *competing* licensees actually *participate* to determine the value of the rights. The Order reads this limitation out of the statute and is therefore facially invalid. The FCC's definitions of "participate" and "competing" "def[y] the plain language of [the] statute" and are also "utterly unreasonable and thus impermissible," and therefore *ultra vires*. *Am. Library Ass'n*, 406 F.3d at 699 (internal quotation marks omitted); *see also Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984).

### 2. The FCC's Rule Is Arbitrary And Capricious Because The FCC Relies On Inappropriate Factors, Offers An Implausible Explanation, And Is Internally Inconsistent

Congress required two competing licensees to participate in the incentive auction to ensure that each reverse auction transaction reflects the value of the spectrum rights being relinquished as determined by competitive bidding. *See* 47 U.S.C. § 309(j)(8)(G); 158 Cong. Rec. E237-38 (daily ed. Feb. 17, 2012) (extended remarks of Rep. Upton) (incentive auctions "must have competition on the 'reverse' side—the portion of the auction that sets the buy-out price. To do otherwise would provide insufficient market competition to minimize costs and would create little more than a substitute for a license transfer."). Yet the FCC defied the stat-

ute's mandate for value determination in favor of recovering the greatest amount of spectrum possible through its "commit[ment] to removing barriers to … voluntary participation" in the reverse auction.  JA__(Order¶2).  In other words, the FCC decided that complying with the two competing participant requirement might limit the amount of spectrum that it could reallocate.  *See* JA__(Order¶415) (requiring two bidders in a market could preclude an "otherwise willing and eligible broadcast television licensee" from bidding).  So the Commission adopted an implausibly broad interpretation of "participation" and "competing" that allows the Commission to pay a broadcaster to relinquish its spectrum rights even if it is the only bidder in the market or the country.  *See* JA__(Order¶¶413-14).

The Commission reads Congress's limitations on the FCC's incentive auction authority out of existence.  While this may serve the FCC's own objectives, it violates the plain terms of the Spectrum Act and the APA.  *See Dep't of the Treasury*, 739 F.3d at 21; *Oceana*, 670 F.3d at 1243; *see also Sandifer*, 134 S. Ct. at 878.  Moreover, as discussed above, the FCC's proffered explanation for its interpretation of "participation" and "competing," *see* JA__(Order¶¶414-15), is entirely unreasonable.

The FCC has simply rationalized a way around a fundamental limit on its reverse auction authority.  And it is plainly a rationalization:  everywhere *except* the section of the Order discussing the "two competing licensees" requirement, the

FCC recognizes that a station must actually bid to participate and that there is *not* a single, unified national market because price competition is local. Yet the Order contemplates FCC payments to stations in single-bidder markets. This cannot meet any reasonable interpretation of the requirement that "two competing licensees participate" in the reverse auctions in those markets. The reverse auction process is therefore arbitrary and capricious and unlawful under the APA. *See Sorenson Commc'ns*, 755 F.3d at 707; 5 U.S.C. § 706(2)(A).

## IV. The Order's Deficiencies Require Vacatur

Under the APA, this Court "shall" vacate agency action that is arbitrary and capricious, an abuse of discretion, or not in accordance with law. 5 U.S.C. § 706(2)(A); *see also NRDC v. EPA*, 489 F.3d 1250, 1262 (D.C. Cir. 2007) (Randolph, J., concurring). "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated …." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (citation and alteration omitted); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (same).

This Court sometimes determines whether to vacate by weighing "the seriousness of the … deficiencies" of the agency's action and the "the disruptive consequences" of vacatur. *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150 (D.C. Cir. 1993) (internal quotation marks omitted). Even applying those factors, vacatur

would be required here.  The FCC's violations of the statute cannot be fixed or explained away.  *See id.*  And since the FCC can still use the methodology that OET Bulletin 69 describes and otherwise comply with the Spectrum Act, vacating the new method for calculating coverage area and population served, the 39-month go-dark deadline, and the Commission's interpretation of the "two competing licensees" requirement will cause no meaningful disruption or delay.

## CONCLUSION

For the foregoing reasons, NAB and Sinclair request that this Court grant the petitions for review and vacate so much of the Order as adopts *TVStudy* and its modified data sources, fails to protect against terrain losses, denies protection to areas that are currently unpopulated, and fails to protect populations served by fill-in translators (and specifically sections III.B.2 and III.B.3.d.iii of the Order), as well as the Declaratory Ruling in its entirety.  Sinclair further requests that this Court vacate so much of the Order as:  (i) requires stations to cease broadcasting on their pre-auction channels no later than 39 months after the release of channel reassignments, without exception, as specifically addressed in section V.C.2 of the Order; and (ii) allows the FCC to complete reverse auction transactions in single-bidder markets, as specifically addressed in section IV.B.1.d of the Order.

Dated:  November 7, 2014                  Respectfully submitted,

/s/ Miguel A. Estrada
Miguel A. Estrada
   *Counsel of Record*
Rick Kaplan                               Scott P. Martin
Jerianne Timmerman                        Lucas C. Townsend
Patrick McFadden                          Ashley S. Boizelle
NATIONAL ASSOCIATION OF                   GIBSON, DUNN & CRUTCHER LLP
BROADCASTERS                              1050 Connecticut Ave., N.W.
1771 N Street, N.W.                       Washington, DC  20036
Washington, DC  20036                     Telephone:  (202) 955-8500
Telephone:  (202) 429-5430                Facsimile:  (202) 467-0539
                                          MEstrada@gibsondunn.com

    *Counsel for Petitioner National Association of Broadcasters*


/s/ John K. Hane
John K. Hane
   *Counsel of Record*
Jeetander T. Dulani
Cynthia Cook Robertson
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
2300 N. Street, N.W.
Washington, D.C.  20037
Telephone:  (202) 663-8116
john.hane@pillsburylaw.com

    *Counsel for Petitioner Sinclair Broadcast Group, Inc.*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
## AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 17,972 words, as determined by the word-count function of Microsoft Word 2003, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.

  /s/ Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
(202) 955-8500

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of November, 2014, I electronically filed the foregoing Joint Opening Brief for Petitioners National Association of Broadcasters and Sinclair Broadcasting Group, Inc. with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  I also hereby certify that I caused 5 copies to be hand delivered to the Clerk's Office pursuant to Circuit Rule 31(b).

Service was accomplished on the following parties via the Court's CM/ECF system:

Richard K. Welch
Jacob M. Lewis
C. Grey Pash, Jr.
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C.  20554
richard.welch@fcc.gov
jacob.lewis@fcc.gov
grey.pash@fcc.gov
*Counsel for FCC*

Robert B. Nicholson
Robert J. Wiggers
U.S. Department of Justice
Antitrust Division, Room 3224
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530-0001
robert.nicholson@usdoj.gov
robert.wiggers@usdoj.gov
*Counsel for United States*

Dominic F. Perella
Hogan Lovells US LLP
Columbia Square
555 13th Street, N.W.
Washington, D.C.  20004-1109
dominic.perella@hoganlovells.com
*Counsel for Competitive Carriers Association*

Catherine E. Stetson
Elizabeth A. Bonner
Hogan Lovells US LLP
Columbia Square
555 13th Street, N.W.
Washington, D.C.  20004-1109
cate.stetson@hoganlovells.com
austin.bonner@hoganlovells.com
*Counsel for Consumer Electronics Association*

Thomas G. Allen
John K. Hane, III
Clifford M. Harrington
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, D.C.  20037-1122
thomas.allen@pillsburylaw.com
john.hane@pillsburylaw.com
clifford.harrington@pillsburylaw.com
*Counsel for Sinclair Broadcast Group, Inc.*

Preston R. Padden
Expanding Opportunities for Broadcasters Coalition
1301 Canyon Boulevard, #306
Boulder, CO  80302
ppadden@me.com
*Counsel for Expanding Opportunities for Broadcasters Coalition*

Michael K. Kellogg
Scott H. Angstreich
Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC
1615 M Street, N.W.
Sumner Square, Suite 400
Washington, D.C.  20036-3209
mkellogg@khhte.com
sangstreich@khhte.com
*Counsel for CTIA —The Wireless Association*

　/s/ Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
(202) 955-8500